IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | | |
|---|---|---|
| LUMINITA DRAGULESCU, Ph.D. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 3:16cv573 |
| | ) | |
| VIRGINIA UNION UNIVERSITY, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT

Plaintiff Luminta Dragulescu, Ph.D. ("Dr. Dragulescu"), by counsel, states as follows for her First Amended Complaint against defendants Virginia Union University ("VUU," "Virginia Union," or the "University"), Evelyn Davis, Ph.D. ("Dr. Davis"), and Michael E. Orok, Ph.D. ("Dr. Orok") (collectively, the "Defendants").

### NATURE OF ACTION

1.      This is an action for Title VII[1] discrimination, Title VII retaliation, and common law defamation. In a nutshell, VUU, mainly through the actions of Dr. Orok, the Dean of the School of Humanities and Social Sciences at VUU, discriminated against Dr. Dragulescu, a white Caucasian who was born in Romania, on the basis of her color, race, gender, and national origin in violation of Title VII. VUU also retaliated against Dr. Dragulescu by not renewing her employment contract for filing an EEOC Charge. Finally, VUU, Dr. Orok, and Dr. Davis defamed Dr. Dragulescu. As a result of these unlawful actions, Dr. Dragulescu now files this action to hold Defendants liable for their wrongdoing.

---

[1] "Title VII" refers to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*

## PARTIES

2.      Dr. Dragulescu is a white Caucasian female who was born in Suraia, Romania and came to the United States in July 2001. Since that time, Dr. Dragulescu has remained in the United States, and she is currently legally able to be in the country through her H1B Visa. For the last four years, her visa has been sponsored by VUU.

3.      VUU is a private university located at 1500 N. Lombardy Street in Richmond, Virginia. It employs more than 200 people and is an "employer" for purposes of Title VII.

4.      Dr. Davis is a current VUU employee.  She is a black African-American female. At all relevant times prior to the end of 2013, Dr. Davis was the Chair of the Department of Languages and Literature (the "Department"), which is in the School of Humanities and Social Sciences (the "SHSS" or the "School of Humanities").

5.      Dr. Orok is a current VUU employee. He is a black African-American male. From the summer of 2014 to the present, Dr. Orok has been the Dean of the School.  He is involved in most of the incidents at issue in this lawsuit.

## JURISDICTION AND VENUE

6.      Jurisdiction is conferred on this Court by 28 U.S.C. § 1331 and 28 U.S.C. § 1343. Pendent and supplemental jurisdiction of the common law count (Count III) is conferred pursuant to 28 U.S.C. § 1367.

7.      Venue is proper in this district and division pursuant to 28 U.S.C. § 1391, as this is the district and division where a substantial part of the events or omissions giving rise to the claim occurred.

**FACTUAL BACKGROUND**

**A.    DR. DRAGULESCU'S EXCEPTIONAL QUALIFICATIONS AND SKILLS**

8.      Dr. Dragulescu is an exceptionally well-qualified and gifted teacher, notably in the area of English studies. In 1997, she received her Bachelor of Arts degree from the University of Bucharest in Romania, where she majored in both (i) Romanian Language and Literature and (ii) English Language and Literature. She then furthered her studies in 1999 while on an EU "Socrates" Scholarship in Bristol, England.

9.      In 2004, Dr. Dragulescu received her Masters of Arts in English from West Virginia University. In 2011, Dr. Dragulescu received her Doctorate in English from the same institution.

10.      Dr. Dragulescu also taught numerous English, Literature, and Writing classes prior to coming to VUU.  Notably in this regard, from 2001 to 2002, Dr. Dragulescu taught at the Linsly School (a college preparatory school) in Wheeling, West Virginia, pursuant to a Fulbright International Teacher scholarship. This scholarship was at the time awarded to only two persons from Romania on an annual basis. Thereafter, Dr. Dragulescu taught several college courses as a graduate teacher assistant at West Virginia University while she pursued her masters and doctorate degrees.

11.      Also during this period, Dr. Dragulescu received many awards and honors, including, but not limited to, the WVU Meritorious Dissertation Fellowship in 2010, the Jackson Fellowship Supplement from 2005 to 2008 and the Stephen F. Crocker Fellowship Supplement from 2002-2005. Beginning in 2006, Dr. Dragulescu also became, and has remained, a member of the Iota Iota Iota Women's Studies Honorary Society.

**B.    DR. DRAGULESCU'S EMPLOYMENT AT VUU**

12.      In 2012, VUU hired Dr. Dragulescu to be an Assistant Professor of English.  At that time, and then for the three years thereafter, Dr. Dragulescu was offered – and accepted – a one-year

appointment for employment at the University.

13.     During her employment at VUU, Dr. Dragulescu, as she had been before, continued to be widely recognized for her scholarship and expertise in English studies, particularly with respect to how literature and culture reflect on the traumatic effects of racism on individuals and communities. Among other things, from 2012 to 2015, Dr. Dragulescu (i) published two peer-reviewed articles in this area, (ii) authored chapters in anthologies of literary criticism, and (iii) spoke at conferences or workshops on seven different occasions. She also was invited to speak as a panelist at a prestigious conference at Oxford University in England in the summer of 2015, but as explained below, she was unable to attend.

14.     A further example of Dr. Dragulescu's high level of scholarship at VUU is the fact that she, together with fellow VUU Professor Raymond P. Hylton, Ph.D ("Dr. Hylton"), was awarded a $98,456 HBCU[2] grant from the National Endowment for Humanities ("NEH").  The topic of the grant, which Dr. Dragulescu wrote, was *Teaching African American Heritage Through Leaning Communities*. The grant was awarded effective January 2015 and runs through January 2017.

15.     As a result of Dr. Dragulescu's work with the grant, the NEH invited her to be a Humanities Initiative review panelist in September, 2015, and invited her again to Washington DC, in February, 2016, to give a lecture on "The Voice of Experience" to new grant directors. She trained VUU faculty to teach learning communities, and she facilitated a teaching workshop at The Atlantic Center for Learning Communities for faculty from the American and Canadian East Coast.

16.     A final (but by no means exhaustive) testament to Dr. Dragulescu's skills as a scholar and professor occurred in the Spring of 2016, when Dr. Dragulescu was nominated for the Scott &

---

[2] "HBCU" refers to "Historically Black College & University."

Stringfellow Outstanding Professor of the Year Award at VUU. Although Dr. Dragulescu did not submit her dossier (because her contract was not renewed by the University), the simple fact that she was nominated is considered both a high honor and a recognition of her teaching skills.

**C.    DESPITE HER SUCCESS AS A TEACHER AND SCHOLAR, DR. DRAGULESCU IS SUBJECTED TO BLATANT DISCRIMINATION AT VUU**

**(a)    The Hierarchy And The Key Players At VUU**

17.    As a professor of English, Dr. Dragulescu worked in VUU's Department of Languages and Literature, which, as noted above, is in the School of Humanities.

18.    When Dr. Dragulescu first began working at VUU, Dr. Linda Schlichting was the Dean of the School of Humanities. Dr. Schlichting is a white Caucasian female.

19.    Thereafter, in the summer of 2014 (after a brief period where an interim dean served for a few months), Dr. Orok became the Dean of the School of Humanities. He has been the Dean of the School of Humanities since that time.

20.    When Dr. Dragulescu first began working at VUU, Dr. Eve Davis was the Chair of the Department.

21.    Dr. Davis was replaced in 2013.  Her replacement – and the acting Chair for most of the incidents at issue in this lawsuit – was Ms. Shannan Wilson (who does not hold a doctorate degree), who is a black African-American female.

22.    Thereafter, beginning in January 2016, Ms. Wilson was replaced by Dr. Monique Akassi ("Dr. Akassi"), who is also a black African-American female.

**(b)    The Fall 2013 Disciplinary Letter Incident**

23.    At many points in time during her employment at VUU, Dr. Dragulescu experienced discrimination, especially based on her race (Caucasian) and her color (white).

24.    One notable incident occurred in the Fall of 2013 when Dr. Dragulescu received a

harsh – and totally unfounded – disciplinary letter from her then-Chair, Dr. Davis. The letter was sent not only to Dr. Dragulescu, but also to her personnel file and to Dr. Schlichting, the then-Dean.

25.     In that letter and, *as well*, in a meeting that occurred relating to the letter, Dr. Davis engaged in numerous *ad hominem* and false attacks on Dr. Dragulescu.  Among other things, Dr. Davis falsely accused Dr. Dragulescu of (i) talking disparagingly about the Department, (ii) having "meltdowns" and temper tantrums; and (iii) using profanity in reference to a training session.  Indeed, in her letter, Dr. Davis specifically falsely accused Dr. Dragulescu of calling the training at issue "f---ing bulls—t."

26.     Dr. Davis also falsely attacked Dr. Dragulescu for not properly contributing to the HBCU mission of VUU by failing to attend the University's Constitution Day Program.  For example, in her letter, Dr. Davis, in a thinly veiled attack on Dr. Dragulescu's "whiteness," wrote: "Need I remind you that this is a HBCU and we are proud of our heritage; instructors, who elect to teach here must understand the mission and heritage in order to convey information in a credible way."

27.     There was no factual basis whatsoever for the disciplinary letter, and, instead, Dr. Davis gave the reprimand purely as a way of showing the "white" professor who was in charge in the Department (i.e., the "black" Chair). Indeed, Dr. Davis wrote and sent the letter to Dr. Dragulescu without (i) first speaking to her about any of the alleged problems at issue; and (ii) even bothering to contact Dr. Schlichting, which would have been a normal act of both protocol and courtesy.  As well, Dr. Davis' disciplinary letter was far harsher than any discipline she had ever meted out against any black African-American VUU employees, including professors.

28.     Upon learning of the disciplinary letter, Dr. Schlichting immediately ordered that it be rescinded.  She also attempted to address Dr. Davis' apparent concerns, mainly by trying to arrange a joint meeting with herself, Dr. Davis, and Dr. Dragulescu. Dr. Davis, however, had no desire for

such a meeting.

29.     In lieu of the meeting, Dr. Schlichting wrote Dr. Davis a memorandum advising her that her disciplinary letter was unwarranted and outside of protocol. Dr. Schlichting said, for example, that "In my 5 ½ years as Dean, we have never sent a disciplinary letter to be placed in an employee's personnel file." Dr. Schlichting also emphasized how such placement could be especially harmful to Dr. Dragulescu, explaining "[t]his action has serious ramifications, especially since Dr. Dragulescu is here on a work visa until she can get her green card."

30.     Further in her memorandum, Dr. Schlichting explained how she was troubled at the unnecessarily disproportionate nature of the discipline issued by Dr. Davis.  She wrote: "As Dean of the school, it is important to me that we treat students and employees fairly. From the School perspective, your actions were much more harsh than others [sic] actions in the past, and where issues with faculty were much more serious."

31.     Finally in her memorandum, Dr. Schlichting confirmed Dr. Dragulescu's value to VUU.  She told Dr. Davis: "Dr. Dragulescu is clearly an intelligent, enthusiastic and creative professor and with guidance from you she will have the best opportunity to succeed."

32.     Dr. Davis was furious at Dr. Schlichting's memorandum.  Soon after receiving it, she went to Dr. Schlichting's office, told her that she [Dr. Schlichting] was undermining her authority, and accused her of being racist. Dr. Davis made these accusations so loudly that students, faculty, and office staff could clearly hear her rant to Dr. Schlichting. While Dr. Schlichting tried to respond to Dr. Davis, Dr. Davis refused to listen to her and, instead, continued to loudly talk over her and then walked out the door.

33.     Dr. Davis then went further.  She issued an ultimatum to Dr. Julius E. Scipio, the then-Vice President of Academic Affairs ("VPAA") at VUU to either fire Dr. Dragulescu and Dr. Tim

Wenzell (another white professor who worked in Dr. Davis' Department) or she would resign as Chair.  Dr. Scipio refused and Dr. Davis was soon replaced as the Chair of the Department.

34.     Dr. Davis' false and defamatory statements in the fall of 2013 were the culmination of several continuous months of her showing open hostility to, and open disdain for, Dr. Dragulescu. For one, in the spring of 2013, Dr. Davis was angry at Dr. Dragulescu for (properly) raising issues about a student's plagiarism in her class and then refusing to give the offending student a passing grade.  Dr. Davis had wanted to allow the student to pass despite the plagiarism.

35.     Separately, in the same time frame, Dr. Davis was angry with Dr. Dragulescu about the VUU Writing Center ("WC"), which Dr. Davis managed.  Specifically, Dr. Davis wanted all the English instructors (except for her and another person) to devote three hours of time (out of the professor's office hours) to the Writing Center, claiming that it was a Quality Enhancement Program ("QEP") requirement.  However, since the QEP handbook did not state any such requirement, the professors pushed back, arguing that they should either receive additional compensation for performing such work or otherwise not be required to work at the Center. As a result, student interns who worked at the Writing Center and who received a small stipend were dismissed.

36.     Dr. Davis was furious about this push-back, and she was especially angry at Dr. Dragulescu for listening to one student intern's complaint. She confronted Dr. Dragulescu about the issue, loudly told her that she was in "cahoots" with other professors at VUU, and then loudly threatened that she would go to President Perkins after ask him to fire her. This episode greatly upset Dr. Dragulescu and it was one of several incidents where Dr. Davis openly yelled or spoke unnecessarily loudly at Dr. Dragulescu.

37.     These incidents were only the beginning with Dr. Davis. As explained below, Dr. Davis refused to relinquish her racist anger about Dr. Dragulescu, and she resurfaced in the Fall of

2015 in a way that only confirmed the obvious discriminatory – and hostile -- motives behind VUU's later actions against Dr. Dragulescu.

### (c)    The Student Paper Comments Incident

38.    Although the disciplinary letter issue appeared to be resolved by the end of 2013, things got far worse for Dr. Dragulescu in May 2015.

39.    Specifically, on May 4, 2015, Dr. Orok called Dr. Dragulescu into a meeting with him, her, and Ms. Wilson (the interim Chair of the School) to discuss a complaint that had been made by a parent about comments that Dr. Dragulescu had made on her son's research paper. According to the parent, as relayed by Dr. Orok, the student felt that Dr. Dragulescu had called him "ignorant" and had made comments that were "offensive."

40.    Dr. Dragulescu strongly disagreed with this characterization.  She explained to both Dr. Orok and Ms. Wilson that her criticisms on the student's paper were specifically directed at the student's lack of understanding of the subject matter at issue and his obvious failure to properly research the subject matter. They were ***not***, she emphasized, personally directed at the student, and they were not *ad hominem* attacks on the student.

41.    Notwithstanding her explanation, Dr. Orok asked – *but did not require* -- Dr. Dragulescu to mollify the parent and to apologize to both the student and the parent about her comments. In doing so, Dr. Orok pointedly suggested to Dr. Dragulescu that she did not understand African-American culture and that perhaps if she had such an understanding, she would not have made such comments on the paper.  He, supported by Ms. Wilson, explained that in the national context of black men being killed by the police, the [black] student may have resented a white professor criticizing his writing.

42.    Dr. Dragulescu listened to Dr. Orok's request, but politely refused to give an apology to either the parent or the student.  As she explained to him, apologizing to a student or his parent for a "non-offense" would undermine her professional integrity and would essentially open the door for every disgruntled student across campus to resort to making such a complaint to gain an advantage in class.  Dr. Orok acknowledged this concern and responded by (i) specifically saying that he would not "force" Dr. Dragulescu to do anything she did not wish to do and (ii) emphasizing that he was merely making a request.

43.    *Within five minutes* of the ending of the meeting, however, Ms. Tracy Lucas, Dr. Orok's administrative assistant, sent Dr. Dragulescu an e-mail on behalf of Dr. Orok telling her that because of an alleged lack of funds, she was being denied travel support to attend the conference at Oxford University, where she was an invited speaker. Dr. Orok's withdrawal of travel support was diametrically opposed to his pledge – ***only days before*** – to provide such monies to Dr. Dragulescu to help with the travel costs.

44.    The withdrawal of this travel support effectively canceled Dr. Dragulescu's ability to attend the conference. It also scuttled her ability to have the paper she was supposed to present at the conference published in a volume by the Oxford University Press.  This is because only those present for the duration of the conference are allowed to submit their papers for publication.

45.    *Even worse, the very next day*, on May 5, 2015, Dr. Dragulescu found a written memo to her from Dr. Orok that had been slipped underneath her office door either by Dr. Orok or someone acting on his behalf. The memorandum purported to summarize the meeting the day before, but it did so in a noticeably misleading way. Importantly, in the document, Dr. Orok criticized Dr. Dragulescu for using words such as "ridiculous" and "ignorant" in her written comments on the student's paper, falsely indicating that Dr. Dragulescu had called the student "ridiculous" and "ignorant."

46.     The truth, however, was that Dr. Dragulescu had only used these words (and others) in reference to the student's actual work product in the paper. Specifically: (i) in reference to a wildly unsupported opening sentence in the paper: Dr. Dragulescu wrote "that's a ridiculous statement. How could you support it?!!"; and (ii) in reference to two other factually wrong statements located later in the paper, she wrote "This shows your ignorance **on the topic**." (emphasis added).

47.     At no point did Dr. Dragulescu say anything *ad hominem* about the student and/or his intelligence and, indeed, at no point prior to her May 4, 2015 meeting with Dr. Orok did the student ever complain *to her* that he felt insulted or that he believed her comments were inappropriate or otherwise offensive. To the contrary, Dr. Dragulescu worked with the student every day that week because she was determined to have him improve his drafts. The draft on which she write those comments was ungraded, part of her one-on-one work with the student.

48.     Dr. Orok also falsely wrote in the memorandum that Dr. Dragulescu had disobeyed his instructions about how to resolve the incident. Specifically, he said Dr. Dragulescu had "refused to *comply*" (emphasis added) with his proposed solutions (even though, of course, he never gave Dr. Dragulescu a *command* and, instead, merely *suggested* that she apologize to the student and his parent) and that, as a result, she had demonstrated an "uncaring attitude and disregard for the repercussion [sic] that would accompany [her] demeanor."

49.     Finally, Dr. Orok, in gratuitously harsh language, closed his memorandum by threatening Dr. Dragulescu.  He said:

> I am . . . reminding you that ***your refusal to follow my instructions*** is [in]appropriate and ***amounts to insubordination***, subsequent actions such as this will not be tolerated. As your Dean, I am responsible for upholding the reputation, and image of the University, among other things, and ensuring that what we do supports our efforts. Your continuous refusal to follow administrative directions is professionally irresponsible and may lead to additional personnel actions.

(emphasis added).

50.     The memorandum was cc'd to, among others, the Vice President of Institutional, Research, Planning, and Special Programs (Dr. Anthony Thompson) and the Assistant Provost/Vice President for Academic Affairs (Dr. Wilbert Jenkins). It was also delivered to Dr. Dragulescu's office in an unusual manner, slipped, as noted above, under her office door, but not doubled by an electronic version of that letter.

51.     As another repercussion to Dr. Dragulescu's refusal to apologize to the student and his mother about the paper, Dr. Orok stalled the issuance of her employment contract at the University. Specifically, on May 6, 2016, all faculty members at the School were summoned to the Dean's office to receive their 2015-2016 VUU employment contracts. Dr. Dragulescu, however, was not so summoned, and, instead, she was told by Dr. Orok's assistant, Ms. Lucas, that Academic Affairs had not sent her contract. When the President of the VUU Faculty Senate, Dr. Peter Sutton, asked on Dr. Dragulescu's behalf about the contract, he was given the same answer – i.e., that the contract was with Academic Affairs.  However, in a later meeting with Dr. Thompson (the then-Assistant to the VPAA) related to Dr. Dragulescu's grievance, the Senate Committee handling the grievance was told that the contract had actually been with Dr. Orok the whole time and not with Academic Affairs.

52.     As a final consequence of Dr. Dragulescu's refusal to apologize to the student and his mother about the comments on the paper, on May 11, 2015, Dr. Dragulescu received an inappropriately sub-par annual performance evaluation from Ms. Wilson. Specifically, she received a 2.5 on a scale of 5.

53.     All of these acts of mistreatment occurred because Dr. Dragulescu is a white female foreign national. No one else in the Department or the School of Humanities had ever been told to apologize to a student or a student's parent because they did not understand "black" culture and no

African-American professor under Dean Orok's command or authority had ever experienced any such acts of discipline or such negative actions.  In fact, even Dr. Peter Sutton, a fellow professor at VUU and the President of the Faculty Senate for most of the proceedings described below, admitted to Dr. Dragulescu that VUU Chairs commonly used faculty evaluations to "reward or punish faculty."  Here, of course, the issue was punishment.

### (d)    Dr. Dragulescu Appeals Dr. Orok's Bogus Reprimand

54.    Dr. Dragulescu was outraged when she received Dr. Orok's memorandum. She immediately drafted a grievance letter to the President of the VUU Faculty Senate, Dr. Sutton, and sent it to him on May 11, 2015. She also e-mailed a copy of her letter to the Office of Student Integrity and Conduct.

55.    In her letter, Dr. Dragulescu focused primarily on four points. First, she noted the complete lack of merit to the accusation that she had insulted the student. To prove her point, she attached (i) the student's paper (which had her comments), (ii) Dr. Orok's letter of reprimand, and (iii) her response to the letter. Through these three documents, Dr. Dragulescu explained that without a doubt, her words had been taken completely out of context in order for Dr. Orok and the student to make false allegations against her.

56.    Second, Dr. Dragulescu noted her total surprise of having the May 4, 2015 meeting with the Dean and the Interim Chair in the first place. She explained, for example, how no one had alerted her to any problems with her comments on the student's paper until the meeting. She also explained that *after* that meeting, she learned for the first time from Dr. Molloy, the student's advisor, that the student had told Dr. Molloy that he had barely abstained from "punching [Dr. Dragulescu] in the face." The fact that a male student threatened physical violence against a professor, a woman to boot, did not appear to bother either the Dean or the Chair in the least, as the issue was not even

addressed or raised by either of them at the May 4th meeting.

57. Third, Dr. Dragulescu emphasized how she had ***not*** been given a command or order by Dr. Orok to apologize to the student or his mother. Instead, Dr. Orok simply offered suggestions to her and, moreover, specifically and expressly told Dr. Dragulescu that he was not forcing to do anything.

58. And fourth, Dr. Dragulescu identified the immediate aftermath that befell her after she refused to apologize to the student and/or his mother. Among other things: (i) *within minutes*, Dr. Orok immediately withdrew his financial support for Dr. Dragulescu for her trip to Oxford University; (ii) *within a day*, Dr. Orok immediately reprimanded Dr. Dragulescu in a memorandum; (iii) *within two days*, Dr. Dragulescu did *not* receive an employment contract – *unlike every other professor in the School*; and (iv) *the very next week*, Ms. Wilson (who attended the meeting) gave Dr. Dragulescu a sub-par and factually invalid performance evaluation that was issued in complete disregard to the VUU Faculty Evaluation Manual and the SACS regulations.3

59. Also, on the same day she grieved Dr. Orok's reprimand, Dr. Dragulescu separately challenged her bogus performance evaluation from Ms. Wilson. In this regard, she filed a written grievance with Dr. Sunita Sharma ("Dr. Sharma"), in her capacity of Chair of the Faculty Evaluation Committee. On June 3, 2015, Dr. Sharma responded that she would address this separate grievance after the Senate grievance process had moved farther along.

**(e)     The Faculty Senate Wholly Supports Dr. Dragulescu's Grievance**

60. On May 18, 2015, the VUU Faculty Senate formed a Committee to handle Dr. Dragulescu's grievance. The members of the Committee included Dr. Carlietta Paige-Anderson, Dr. Hylton, Dr. Judith Powell, and Dr. Sharma.

---

3 "SACS" stands for the Southern Association of Colleges and Schools.

61.     On Wednesday, June 3, 2015, the Committee, through Drs. Sharma and Hylton, handed in the grievance paperwork to Dr. Dragulescu, Dr. Thompson, and Dr. Orok.

62.     On Tuesday, June, 16, 2015, the Committee (Drs. Hylton, Powell, and Sharma[4]) met with Drs. Thompson and Jenkins to discuss the grievance. The two men told the Committee that Dr. Dragulescu had insulted the student.  They made these statements despite the Committee's rebuttal document and despite the express advice given to the two administrators by the Committee that they should read the document (i.e., the student's paper with Dr. Dragulescu's comments) for themselves.

63.     On Thursday July, 30, 2015, Dr. Dragulescu met with Dr. Hossain, the new VPAA, at his invitation, to discuss the matter.   At that time, she provided Dr. Hossain with all of the documentation at issue, some of which Drs. Jenkins and Thompson had not shared with him (notably, Dr. Dragulescu's letter to Dr. Orok and the student's draft), as well as her CV and teaching philosophy.

64.     On Wednesday, September 16, 2015, the Senate held a hearing on Dr. Dragulescu's grievance. Dr. Orok specifically declined to participate. He tried to give the excuse that he would be out of town on the day, but he still refused even after Dr. Sutton offered to move the Senate Hearing to a more convenient time for Dr. Orok. Dr. Hossain briefly attended the hearing at the beginning, to acknowledge the importance of the process.

65.     On Friday, September 18, 2015, the Senate voted unanimously for a resolution to have Dr. Orok's memo stricken from Dr. Dragulescu's record and to have Dr. Dragulescu reevaluated according to the VUU Faculty Evaluation Manual and SACS regulations.

66.     On Thursday, September 25, 2015, the VPAA sent Dr. Dragulescu a copy of the Senate Resolution.

67.     On Tuesday, October 13, 2015, Dr. Dragulescu contacted Dr. Hossain via email and

---

[4] Dr. Paige-Anderson could not attend, but she was informed about the meeting in detail.

asked him for an update.  In doing so, she expressed her dismay on hearing, again, that there are

rumors across the VUU campus that she calls students "ignorant." This, of course, was exactly the

misrepresentation in the Dean's memo of reprimand.  She asked Dr. Hossain to intervene to clear her

name.

68.     On Wednesday, October 14, 2015, the VPAA replied to Dr. Dragulescu that it would

get back to her soon. Dr. Hossain said: "I intend to meet with you soon after my meetings with others."

To this date, no meeting that addressed the issue has ever happened.

      **(f)**      **Dr. Davis Rears Her Head Again And Interferes With Dr. Dragulescu's Grievance. She Defames Dr. Dragulescu and Also Ensures That Dr. Orok's Defamation Will Remain In Place *Ad Infinitum***

69.     On Thursday, October 15, 2015, the Senate re-elected Dr. Sutton as President. Dr.

Sutton then announced that the VPAA had received *new evidence* from Dr. Davis (Dr. Dragulescu's

former Chair) about Dr. Dragulescu's alleged insubordination. As such, based on this new evidence,

he decided that Dr. Orok's reprimand memorandum would remain in Dr. Dragulescu's personnel file,

but that she would be reevaluated.

70.      The Senate vehemently protested being left outside of this new development and it

decided to write a letter in which it formally disagreed with this turn of events in the process, and

stated that it stood by the initial resolution.

71.     Upon information and belief, the "new" evidence from Dr. Davis was *unsolicited* and

had not otherwise been kept or maintained in any formal Human Resources or VUU personnel file

pertaining to Dr. Dragulescu.  Instead, Dr. Davis unilaterally interjected this new evidence on her own

accord and, in doing so, introduced such evidence to an audience of people who had never before

seen – or even had a reason to see – it.

72.     In the meantime, Dr. Dragulescu contacted Dr. Hossain immediately and requested

that he send her the "new" documents and allow her to respond to them.  He agreed.

73.     On Friday, October 16, 2015, Dr. Dragulescu sent Dr. Hossain her response to the Dr. Davis's "new" materials and also let him know that she would be contacting Dr. Schlichting for input.

74.     On Monday, October 19, 2015, Dr. Hossain left a package with copies of the "new" evidence in Dr. Dragulescu's mail box, at school.

75.     On Tuesday, October 20, 2015, Dr. Dragulescu learned that Dr. Sutton had sent the Faculty Senate's letter of protest against the new turn of events to the VUU administration.

76.     Also on that date, Dr. Dragulescu read the package of the so-called "new" evidence. She was shocked and dumbfounded. Primarily, the package consisted of letters of reprimand from Dr. Dragulescu's former Chair, Dr. Davis. Those letters, however, were the ones that had been officially ordered to be taken out of Dr. Dragulescu's HR file, as Dr. Schlichting had found them to be unfair and the Chair out of line in her procedures when issuing them.

77.     Oddly, the package also contained attendance sheets from the VUU Writing Center, marking absences and tardies that Dr. Dragulescu and two other colleagues-- Dr. L. Johnson, a white male whose contract was not renewed, and Dr. Tim Wenzell (a white male) – had accumulated. As noted above, the WC hours had been an issue of discontent in the School of Humanities since the WC's inception. The former VPAA, Dr. Julius Scipio, however, had agreed that the professors cannot be forced to do such hours without compensation, especially as there only some professors who were required to do service, but not others.

78.     On October 21, 2015, Dr. Wenzell, in support of Dr. Dragulescu, sent his own package to Dr. Hossain, containing various letter/memo exchanges between Dr. Davis and him, and testifying about the poor treatment to which both he and Dr. Dragulescu had been subjected during Dr. Davis' management of the Department.

79.     Then, on Saturday, October 24, 2015, Dr. Schlichting, the now retired former Dean of the School, provided her own support for Dr. Dragulescu to Dr. Hossain.  Specifically, she provided him with a copy of the memorandum she had written back in November 2013 and also provided a brief narrative of Dr. Davis's inappropriate behavior both in relation with the former Dean and in relation to Dr. Dragulescu and other members of the school.

80.     On Tuesday, November 3, 2015, almost six months to the day after Dr. Dragulescu filed her grievance, she wrote to the VPAA (and cc'd it to the President of the Senate) and asked for an estimate in a resolution finalizing this grievance. Moreover, on Thursday, May 5, 2016, in a last gasp attempt to get a resolution, Dr. Dragulescu, acting in accordance with the VUU Faculty Handbook, sent an overnight package about her case to Dr. Lucille Brown, the Chair of the Academic Affairs Committee of the VUU Board of Trustees.

81.     To this date, Dr. Dragulescu has never received an answer to her inquiry. Nor has the grievance process ever been finalized.  As such, Dr. Orok's false letter of reprimand has been allowed to stay in place and the "new" false accusations unearthed and re-published by Dr. Davis have been allowed to sully the integrity of Dr. Dragulescu's grievance process and her HR file.

82.     As an aside, the only action that was ever formally taken as to the grievance fully validated Dr. Dragulescu's complaints.  Specifically, in late November of 2015, Dr. Hossain assigned Drs. Sharma and Anthony Madu (a professor of Biology) to evaluate Dr. Dragulescu's professional activities for 2014-2015 for purposes of re-evaluating her annual performance evaluation. Ultimately, with Ms. Wilson and Dr. Orok completely removed from the evaluation process, Dr. Dragulescu's evaluation score upgraded from her an initial score of 2.5 (on a scale of 1 to 5, with 5 being the highest score) to a final score of 4.5.

**D.      OTHER ACTS OF DISCRIMINATION AGAINST DR. DRAGULESCU**

83.      Over and above the discriminatory and defamatory acts described above, VUU engaged in other discriminatory and retaliatory acts against her.

84.      First, during the summer of 2015, Dr. Orok refused to sign documents necessary for the NEH grant and sabotaged (through his administrative assistant, Ms. Lucas) the timely and proper issuance of the payment of grant money to Dr. Dragulescu and Dr. Hylton, a fellow white VUU professor.

85.      Second, also during the summer of 2015, VUU stalling the process to renew Dr. Dragulescu's work visa.   This forced her to pay a $1,250 premium processing charge, as the documents were filed barely a month before the start of the academic year.

86.      Finally, as a result of VUU's wrongful non-renewal of Dr. Dragulescu's employment contract (as explained below), Dr. Dragulescu lost her work visa status, had to change her visa status to "visitor" visa and had her "green card" application halted, which has caused a loss of all of the attorney's fees and other expenses she had previously incurred in moving the application forward to fruition.

**E.      DR. DRAGULESCU FILES AN EEOC CHARGE AND VUU THEN RETALIATES HER BY NOT RENEWING HER CONTRACT HER LESS THAN THREE MONTHS LATER AND BECAUSE SHE IS A WHITE CAUCASIAN**

87.      On Wednesday, December 23, 2015, Dr. Dragulescu, by counsel, filed a Charge of Discrimination with the EEOC.

88.      Almost three months later to the day, on Thursday, March 24, 2016, Mrs. Hollace Enoch, VUU's HR Director, served Dr. Dragulescu with a letter stating that her employment contract with VUU would not be renewed.

89.      No explanation was given to Dr. Dragulescu for the decision, but the non-renewal

occurred at the very first opportunity VUU had to terminate its employment relationship with Dr. Dragulescu after she filed her EEOC Charge.

90.     Additionally, in the year before, VUU, through Dr. Orok, decided not to renew the employment contracts of Drs. L. Johnson and Dr. Finch (both of whom are white Caucasians), two white professors who were then-employed at the School.

91.     After VUU decided not to renew her contract, Dr. Dragulescu filed a second, separate EEOC Charge related to the non-renewal decision.

**F.     AFTERMATH**

92.      Based on these and other continuing actions, Dr. Dragulescu has suffered, among other things, financial loss, emotional distress and reputational harm.

**G.     EXHAUSTION OF REMEDIES**

88.     For purposes of her claims under Title VII, Dr. Dragulescu has exhausted her administrative remedies. Her lawsuit also is timely filed within 90 days of the EEOC's issuance of two right-to-sue letters (one for Dr. Dragulescu's claim for discrimination and the other for her claim of retaliation).

**COUNT I:**
**TITLE VII DISCRIMINATION CLAIM**
**(AGAINST VUU)**

89.     The allegations of paragraphs 1-88 are realleged as if fully set forth herein.

90.     By virtue of her status as a white Caucasian female from Romania, Dr. Dragulescu is entitled to Title VII's protection against discrimination based on her color, race, gender, and national origin

91.     Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or *otherwise to discriminate* against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of" her color, race, gender, or national origin.

92.     As is clear from the allegations stated herein, Dr. Dragulescu was discriminated against based on her color, race, gender, and national origin.

93.     As a direct result of the VUU's discrimination, Dr. Dragulescu has been caused to suffer the loss of potential occupational opportunities.  Additionally, Dr. Dragulescu has been caused to suffer personal injury, anxiety, emotional distress, personal and professional humiliation and embarrassment as a result of the VUU's actions.

94.     VUU's actions also constitute gross, wanton, malicious, reckless, and/or intentional violations of Dr. Dragulescu's rights, thus entitling her to punitive damages.

## COUNT II:
### TITLE VII RETALIATION CLAIM
### (AGAINST VUU)

95.     The allegations of paragraphs 1-94 are realleged as if fully set forth herein.

96.     Under Title VII, it is unlawful for an employer to retaliate against an employee for engaging in protected activity under the Act.

97.     Here, Dr. Dragulescu engaged in protected activity when she filed her EEOC Charges regarding VUU's conduct described herein.

98.     VUU unlawfully retaliated against Dr. Dragulescu for engaging in the protected activities not renewing her employment contract.

99.     As a direct result of the VUU's retaliation, Dr. Dragulescu has been caused to suffer the loss of potential occupational opportunities.  Additionally, Dragulescu has been caused to suffer personal injury, anxiety, emotional distress, personal and professional humiliation and embarrassment as a result of the VUU's actions.

100.     VUU's actions also constitute gross, wanton, malicious, reckless, and/or intentional violations of Dr. Dragulescu's rights, thus entitling her to punitive damages.

## COUNT III -- DEFAMATION
### (AGAINST VUU, DR. DAVIS, AND DR. OROK)

101.     The allegations of paragraphs 1-100 are realleged as if fully set forth herein.

102.     Dr. Dragulescu has been defamed by the statements of Drs. Davis and Orok, acting for themselves and on behalf of VUU, specifically referenced and set forth in paragraphs 25, 45, and 48-49 herein, which statements were published and were made with the intent to defame Dr. Dragulescu.

103.     Importantly, Dr. Davis' false and defamatory statements that are referenced herein were published in October 2015 in such a manner as to create an entirely new publication of those statements, even though the original statements were made in 2013.  Likewise, Dr. Orok's false and defamatory statements were not only published in October 2015 as part of the continuing grievance process, his memorandum about Dr. Dragulescu, upon information and belief, has served as the basis for rumors that were circulating as late as October 2015 around the VUU campus that Dr. Dragulescu had called a student "ignorant" and "ridiculous."

104.     The statements at issue in paragraphs 25, 45, 48-49 are false and purport to be statements of fact, not statements of opinion.

105.     Moreover, the false statements at issue all involve defendants' efforts to demean and disparage Dr. Dragulescu, to falsely accuse her of unprofessional occupational activities and unfitness to perform the duties of her job and to prejudice her in her profession and trade. Thus, they are defamatory *per se*.

106.     Upon information and belief, the false and defamatory statements made by Drs. Davis and Orok were made on behalf of and as agents for VUU.  However, to the extent that the

statements were not made on behalf of and as agents for VUU, these individual defendants are personally liable for any damages arising from these statements.

107.     As a proximate cause of the defendants' conduct, Dr. Dragulescu has suffered substantial compensatory damages, including as severe mental and emotional distress, reputational harm, loss of sleep, loss of income, humiliation, embarrassment, loss of time, and other damages.

108.     In addition, the statements by these defendants were made intentionally, willfully, and maliciously against Dr. Dragulescu and with utter and conscious disregard of her rights.  The animosity of Dr. Davis is already fully noted herein, but Dr. Orok also harbored animosity toward Dr. Dragulescu. Importantly, in April 2015, Dr. Orok told a then-VUU employee that Dr. Dragulescu was a "white trailer trash whore" and even spread the false rumor that she was having an affair with another VUU professor, falsely claiming he witnessed the aftermath of an alleged improper encounter between Dr. Dragulescu and her colleague.  As such, no privileges attach to the statements at issue, and, as well, Dr. Dragulescu is entitled to punitive damages

WHEREFORE, Plaintiff requests this Honorable Court to:

a.     Accept jurisdiction of this case.

b.     Declare that Plaintiff has suffered acts of discrimination and retaliation under Title VII at the hands of VUU.

c.     As to Counts I and II, award Plaintiff compensation for loss of salary and other benefits, including all fringe benefits, to which she would have been entitled had she not been discriminated and retaliated against as to her employment. Such damages shall be in an amount in excess of five hundred thousand dollars ($500,000), the exact amount to be determined at trial.

d.     As to Counts I and II, award Plaintiff compensatory damages for the humiliation, damage to her reputation, mental and emotional distress, occupational losses, and pain and

suffering that she has experienced and endured as a result of the unlawful actions of VUU. Such damages shall be in an amount in excess of one hundred fifty thousand dollars ($150,000), the exact amount to be determined at trial.

e.      As to Counts I and II, award Plaintiff front pay and back pay in an amount in excess of five hundred thousand dollars ($500,000), the exact amount to be determined at trial.

f.      As to Counts I and II, award Plaintiff punitive damages in the amount of five hundred thousand dollars ($500,000).

g.      As to Count III, award Plaintiff one million dollars ($1 million) in compensatory and presumed damages arising from VUU's defamation;

h.      As to Counts III, award Plaintiff three hundred fifty thousand dollars ($350,000) in punitive damages arising from VUU's defamation;

i.      Award Plaintiff pre-judgment interest;

j.      Award Plaintiff post-judgment interest;

k.      Award Plaintiff her costs and reasonable attorney's fees; and

l.      Award Plaintiff all such other further and appropriate equitable relief.

**A TRIAL BY JURY IS DEMANDED**

Respectfully submitted,

LUMINITA DRAGULESCU, Ph.D.

By:     <u>s/ Richard F. Hawkins, III</u>
        Virginia Bar Number: 40666
        THE HAWKINS LAW FIRM, PC
        2222 Monument Avenue
        Richmond, Virginia 23220
        (804) 308-3040 (telephone)
        (804) 308-3132 (facsimile)
        Email: rhawkins@thehawkinslawfirm.net

        Counsel for Plaintiff

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 19th day of August, 2016, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF systems which will send notification of such filing

to the following to:

Gilbert E. Schill, Jr. (VSB #12095)
Robyn Gray Davis (VSB #45418)
Tyler S. Laughinghouse (VSB #84099)
McGuire Woods LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219


<u>s/ Richard F. Hawkins, III</u>
Virginia Bar Number: 40666
THE HAWKINS LAW FIRM, PC
2222 Monument Avenue
Richmond, Virginia 23220
(804) 308-3040 (telephone)
(804) 308-3132 (facsimile)
Email: rhawkins@thehawkinslawfirm.net

Counsel for Plaintiff