

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

LUMINITA DRAGULESCU, PH.D.,

    Plaintiff,

v.                          Civil Action No. 3:16cv573

VIRGINIA UNION UNIVERSITY,
et al.,

    Defendants.

### MEMORANDUM OPINION

This matter is before the Court on the MOTION TO DISMISS COUNT III OF THE FIRST AMENDED COMPLAINT ("Def. Mot."), (ECF No. 14), filed by Defendants Virginia Union University, Evelyn Davis, Ph.D., and Michael E. Orok, Ph.D. ("Defendants"). For the reasons set forth below, the Defendants' motion will be granted.

### BACKGROUND

#### A. Relevant Facts

In 2012, Plaintiff Luminita Dragulescu, Ph.D., ("Dragulescu") was hired to be an Assistant Professor of English in the Department of Languages and Literature of Defendant Virginia Union University's ("VUU") School of Humanities and Social Sciences. (Am. Compl. ¶¶ 12, 17). She served in that position from 2012 to 2015, accepting renewed one-year offers of employment each year during that time. Id. Defendant Eva Davis, Ph.D. ("Davis"), served as Chair of the Languages and Literature Department until 2013. (Am. Compl. ¶ 20). Defendant Michael E.

Orok, Ph.D. ("Orok"), became Dean of the University's School of Humanities and Social Sciences in the summer of 2014. (Am. Compl. ¶ 19). During her employment at VUU, Dragulescu alleges that Davis and Orok, acting as agents of VUU, made "false and defamatory statements" in, and in relation to, a "disciplinary letter" authored by Davis in 2013 and through written and verbal comments allegedly made in relation to a "Student Paper Comments Incident" in May of 2015. (Am. Compl. ¶¶ 101-102). She further alleges that these defamatory statements were "published [again] in October 2015 in such a manner as to create an entirely new publication of those statements." (Am. Comp. ¶ 103).

The first alleged defamation, according to the Amended Complaint, occurred in the fall of 2013. (Am. Comp. ¶ 24). According to Dragulescu, it was then that she received a "harsh—and totally unfounded—disciplinary letter from her then-Chair, Dr. Davis." Id. The letter reads:

> Dear Dr. Dragulescu,
>
> In your first year in the department of Languages and literature, I attempted to work with you and tried to see your issues with the students and you're [sic] not getting involved with the department as a learning curve. I tried to encourage you in your frustrations and felt that you would have become comfortable with the University, the department, and the students your second year. I was clearly mistaken, so this letter is to serve as a second warning regarding your behavior/conduct as it pertains to your actions in the department since the beginning

2

of the summer/academic year 2013-2014. For
the record, your first letter dated May 22,
2013, was issued as a result of the deceptive
scores you assigned the second reading of the
diagnostics you were assigned to read.

The specific issues in this letter are:
failure to participate in the Constitution
Day program held September 17, 2013; your
attempt to undermine the department by
speaking disparagingly to new faculty about
the department and other faculty in the
department, your "tantrum" in the hall when
you found that your LC class could not be
taught again until fall 2014, your failure to
take the Aplia training and lastly, your
inappropriate language used Friday regarding
the Aplia training; you were overheard
calling it "f--ing bulls-t." Clearly, this is
beyond acceptable. You were sent the link
after you did not participate in the Webinar
and as of yesterday, you still had not been
on the website. Additionally, you sent our
Cengage Representative an email and asked her
about contacting someone about the "offensive
misuse of your name twice." You could have
informed the Representative of the correct
spelling of your name without the provoking
comments. The department has work [sic] to
establish credulity [possibly sic] with this
publisher, and if something like this happens
again, please let me or the Admin Asst. know
and we will get it corrected.

While I realize that you had a doctor's
appointment on September 17, 2013, you were
in control of when you the appointment, and
even though you were not there, you should
have asked for participation from your
students. I understand that you also
disparaged the program as being an
embarrassment and that you would not
participate. You teach American Literature
and the request I made was not unreasonable.
Need I remind you that this is a HBCU and we
are proud of our heritage; instructors, [sic]
who elect to teach here must understand

3

mission and our heritage in order to convey
information in a credible way.

You have sent students to see me about
inappropriate outburst [sic] in your class;
what message did you send by ranting because
you could not have your way? Faculty and
students were present when you had the
outburst. Lastly, we attempt to teach
students to aspire to more sophisticated
vocabulary in an attempt to verbalize their
frustrations, and your use of profanity is
unacceptable on any level.

I have been on the other end of your
vitriolic emails, the one you wrote regarding
the book selection and the one about Aplia
and I will not revisit this issue again.
[sic]

When I assign faculty to take training or
participate in programs that enhance student
learning, I expect the request to be
followed; you were hired to help build the
department and not to surreptitiously
undermine its morale. I can only hope that
you exercise better judgment in the future
and that you will make a genuine attempt to
become a better colleague by working with and
not against the department.

Sincerely,

Eve Davis, Ph.D., Chair
The Department of Languages and Literature

(Def. Mot., Attach. A 1-2). The letter was also sent to Dean
Linda Schlichting (who preceded Orok as Dean), and placed in
Dragulescu's internal personnel file. (Am. Compl. ¶ 24).
Dragulescu alleges that the letter contained "no factual basis
whatsoever," and was instead issued "purely as a way of showing

the 'white' professor [Dragulescu] who was in charge in the Department (i.e., the 'black' Chair)." (Am. Compl. ¶ 27).

According to the Complaint, Schlichting ordered that this letter be rescinded, and she sent a memorandum to Davis explaining that such letters should not be sent to an employee's personnel file. (Am. Compl. ¶¶ 28-30).[1] Dragulescu alleges that Schlichting advised Davis that the letter was "unwarranted and outside protocol," and that Schlichting told Davis that her "actions were much more harsh than others [sic] actions in the past, and where issues with faculty were much more serious." Id. Dragulescu further claims that Davis responded to this memorandum by issuing an "ultimatum" to the Vice-President of Academic Affairs ("VPAA") at the time, Julius Scipio, Ph.D., to either fire Dragulescu and another employee or she would resign. (Am. Compl. ¶ 33). Following the alleged ultimatum, Davis resigned in 2013. Id.

The next alleged instance of defamation occurred in May 2015, and involved a written memorandum sent by Orok to Dragulescu regarding a "Student Paper Comments Incident." On May 4, 2015, Dragulescu met with Orok and Shannan Wilson, the interim Chair at the time, to discuss a complaint made by a parent of one of Dragulescu's students about comments made by

---

[1] Dragulescu describes Schlichting's memorandum and quotes from it extensively, but the letter is not part of the record and has not been attached to any of the pleadings.

Dragulescu on her son's paper. At that meeting, Orok "asked" Dragulescu to "apologize to both the student and the parent about her comments," but she "politely refused to given an apology to either the parent or the student." (Am. Comp. ¶ 42). The following day, Orok sent Dragulescu the memorandum that forms the basis of Dragulescu's charge of defamation against Orok (hereinafter "Orok Memorandum" or "the memorandum"). The body of the memorandum reads:

> This memo is sent regarding the meeting that you, your department chair, Ms. Shannan Wilson and I had in my office on May 4, 2015 regarding [STUDENT NAME OMITTED], a student in your English 102-01 course at Virginia Union University. [STUDENT] reported to his advisor Dr. Julie Molloy that you used language that were [sic] condescending as you graded his paper. I was also presented with the original student essay with your comments which included such words as "ridiculous" "ignorant" etc. These comments have currently triggered serious concerns by [STUDENT's] mother. She is very upset and is desirous of a solution. I offered you various options for abating this situation before it spiraled out of control. The options included apologizing to the parent etc. You refused to comply. You were additionally non cooperative regarding any options that I offered for remedying the situation, recognizing that this was not the first time that students complained about your aberrant and negative behavior in the class. Clearly, you demonstrated an uncaring attitude and disregard for the repercussion that would accompany your demeanor.

> I am, therefore reminding you that your
> refusal to follow my instructions is
> appropriate [sic] and amounts to
> insubordination, subsequent actions such as
> this will not be tolerated. As your Dean, I
> am responsible for upholding the reputation,
> and image of the University, among other
> things and ensuring that what we do support
> [sic] our efforts. Your continuous refusal
> to follow administrative directions is
> professionally irresponsible and may lead to
> additional personnel actions.

(Def. Mot., Attachment B 1-2). The Senior Vice-President for

Institutional Effectiveness and Program Development and the

Assistant Vice-President for Academic Affairs were apparently

listed as carbon copy recipients of the memorandum.   Id; see

also Am. Compl. ¶ 50.

The defamation alleged in that memorandum appears to be the

assertion that Dragulescu disobeyed an instruction or command

(rather than a request) to apologize to the student and his

mother. Dragulescu also emphasizes (but does not quote) the

sentence from the memorandum that "your comments . . . included

such words as "ridiculous" "ignorant" etc." (Am. Compl. ¶¶ 45-

47). Dragulescu argues that the letter "falsely indicat[ed] that

Dr. Dragulescu had called the student "ridiculous" and

"ignorant." (Am. Compl. ¶ 45).[2]

---

[2] Dragulescu admits to writing ""that's a ridiculous statement.
How could you support it?!!" in one section of the paper, and
"[t]his shows your ignorance on the topic" in another. (Am.
Compl. ¶ 46).

After receiving the Orok Memorandum, Dragulescu sent a grievance letter (to which she attached Orok's memo) to the President of the VUU Faculty Senate, Peter Sutton, Ph.D., challenging various actions taken against her, including the Orok memo and a subpar (2.5/5) performance evaluation (Am. Comp. ¶¶ 54-59). As part of the grievance process, the Faculty Senate formed a Committee (in May of 2016) which eventually met with the parties involved on June 16, 2016. (Am. Compl. ¶¶ 60-61). On June 30, Dragulescu met with the new Vice-President of Academic Affairs, Zakir Hossain, Ph.D., and "provided [her] with all of the documentation at issue." (Am. Compl. ¶ 63).

On September 16, 2015, the full Faculty Senate held a hearing on Dragulescu's grievance. (Am. Compl. ¶ 64). On September 18, 2015, the Faculty Senate voted unanimously for a resolution recommending that the Orok Memorandum be stricken from Dragulescu's record and that she receive a new performance evaluation. (Am. Compl. ¶ 65). On September 25, 2015, Hossain sent Dragulescu a copy of the Senate Resolution. (Am. Compl. ¶ 66).

On October 13, Dragulescu wrote Hossain an email asking him for an update, and "expressed her dismay on hearing, again, that there are rumors across the VUU campus that she calls students 'ignorant.'" (Am. Compl. ¶ 67). Hossain replied that he would get back to her soon. (Am. Compl. ¶68.) Dragulescu asserted for

8

the first time at oral argument that these "rumors" were actionable events of defamation attributable to Orok.

On October 15, 2015, the Faculty Senate re-elected Sutton as its President. (Am. Comp. ¶ 69). Sutton then announced that Hossain had received new evidence from Davis concerning Dragulescu's insubordination, and that he therefore had decided that the Orok Memorandum would remain in Dragulescu's file. Id. The Faculty Senate drafted a letter in response to this decision standing by its original resolution, which Sutton in turn sent to the VUU administration (Am. Compl. ¶¶ 70, 75). Dragulescu responded by requesting access to the new information, which she received the next business day. (Am. Compl. ¶¶ 73-74). The package of evidence contained the Davis letter (from 2013), as well as attendance sheets from the VUU writing center "marking absences and tardies" that Dragulescu "had accumulated." (Am. Compl. ¶ 77).

According to Dragulescu, this series of events in October 2015 (as well as the circulating "rumors") constituted, "as part of the continuing grievance process," "an entirely new publication" of the allegedly defamatory statements of both Orok and Davis. (Am. Comp. ¶ 103). She also alleges that each of these statements were made "intentionally, willfully, and maliciously." (Am. Compl. ¶ 108). Finally, in the last paragraph of her Amended Complaint, Dragulescu alleges that, "in April

9

2016, Dr. Orok told a then-VUU employee that Dr. Dragulescu was a 'white trailer trash whore' and even spread the false rumor that she was having an affair with another VUU professor, falsely claiming he witnessed the aftermath of an alleged improper encounter between Dr. Dragulescu and her colleague." (Am. Compl. ¶ 108). That alleged statement, however, is not alleged as a component of the defamation claim presented in Count III.

### B. Procedural History

The original complaint in this action was filed on July 7, 2016 (ECF No. 1). The Defendants filed an Answer (ECF No. 4) on August 24, 2016, as well as a Motion to Dismiss Count III (Defamation) on the grounds that it failed to state a claim and that it was barred by the statutes of limitations (ECF No. 6). On August 19, 2016, the Plaintiff filed an Amended Complaint against the Defendants (ECF No. 10) with new allegations related to the limitations period. Responding to this Court's order (ECF No. 11) to file any answer or motions with respect to the Amended Complaint by October 11, the Defendants filed a new Answer (ECF No. 16) on October 6, 2016. The same day, the Defendants filed this MOTION TO DISMISS COUNT III OF THE FIRST AMENDED COMPLAINT ("Def. Mot.") (ECF No. 14). Dragulescu filed PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS ("Pl. Resp.") on October 24, 2016 (ECF No. 19). A REPLY

MEMORANDUM OF DEFENDANTS IN SUPPORT OF MOTION TO DISMISS COUNT III OF THE FIRST AMENDED COMPLAINT ("Def. Reply") was filed on November 7, 2016 (ECF No. 25). Oral argument on the motion was heard on November 21, 2016 (ECF No. 22), and the motion is now ripe for adjudication.

**LEGAL STANDARDS**

### A. Challenging the Sufficiency of the Amended Complaint

Fed. R. Civ. Pro 8 "requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal quotation marks and citation omitted); see also McCleary-Evans v. Maryland Dep't of Transp., State Highway Admin., 780 F.3d 582, 585 (4th Cir. 2015). As the Supreme Court has recently made clear, this rule "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555. Instead, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,' " such that it allows the "court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (emphasis added) (quoting Twombly, 550 U.S. at 570). In determining whether the plaintiff

11

has met its burden under <u>Twombly</u> and <u>Iqbal</u>, the Court must "accept the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff." <u>Coleman v. Maryland Court of Appeals</u>, 626 F.3d 187, 189 (4th Cir. 2010).

Typically, a motion pursuant to Rule 12(b)(6) "invites an inquiry into the legal sufficiency of the complaint, not an analysis of potential defenses to the claims set forth therein." <u>Brooks v. City of Winston-Salem, N.C.</u>, 85 F.3d 178, 181 (4th Cir. 1996). Nevertheless, "[i]n the limited circumstances where the allegations of the complaint give rise to an affirmative defense, the defense may be raised under Rule 12(b)(6)." <u>Richmond, Fredericksburg & Potomac R. Co. v. Forst</u>, 4 F.3d 244, 250 (4th Cir. 1993). In reviewing such a motion, the Court may consider any documents "integral to and explicitly relied on in the complaint," even if not attached thereto. <u>Phillips v. LCI Int'l, Inc.</u>, 190 F.3d 609, 618 (4th Cir. 1999). Here that includes the memoranda sent by Orok and Davis, both of which are cited and quoted from extensively in the Amended Complaint, but were attached only to this Motion to Dismiss and not the Amended Complaint itself. (<u>See</u> Am. Compl. ¶¶ 23-26, 45-50).

### B. Virginia Defamation Law

The elements of defamation in Virginia are "(1) publication of (2) an actionable statement with (3) the requisite intent." <u>Jordan v. Kollman</u>, 269 Va. 569, 575 (2005). To prove

12

publication, it is generally "sufficient to show that, when the defendant addressed the defamatory words to the plaintiff, another person was present, heard the words spoken, and understood the statement as referring to the plaintiff." Food Lion, Inc. v. Melton, 250 Va. 144, 150 (1995). The "actionable statement" requirement is more strict.

"To be actionable, the statement must be both false and defamatory." Kollman, 269 Va. at 575. For a statement to even potentially be false, it must also be factual. Tharpe v. Saunders, 285 Va. 476 (2013). Thus, "[s]tatements that express only the speaker's opinion and not matters of fact are not actionable as defamation because such statements cannot be shown to be false." Gov't Micro Res., Inc. v. Jackson, 271 Va. 29, 40 (2006). Generally, "[s]tatements that are relative in nature and depend largely upon the speaker's viewpoint are expressions of opinion." Fuste v. Riverside Healthcare Ass'n, 265 Va. 127, 132 (2003). In every case, however, "whether an alleged defamatory statement is one of fact or opinion is a question of law and is, therefore, properly decided by a court instead of a jury." Id. Thus courts must consider each "alleged defamatory statement . . . as a whole to determine whether it states a fact or non-actionable opinion." Jackson, 271 Va. at 40.

In addition to the falsity requirement, a statement is not actionable unless it is actually defamatory. In Virginia, this

13

means that the allegedly defamatory words must carry "the requisite defamatory 'sting' to one's reputation." <u>Schaecher v. Bouffault</u>, 290 Va. 83, 92 (2015). "Defamatory words are those 'tend[ing] so to <u>harm the reputation of another as to lower him in the estimation of the community</u> or to <u>deter third persons from associating or dealing with him.</u>'" <u>Id</u>. (quoting the Restatement (Second) of Torts § 559) (emphasis added). Such language is of the kind that "tends to <u>injure one's reputation</u> in the common estimation of mankind, to <u>throw contumely</u>, <u>shame</u>, or <u>disgrace</u> upon him, or which tends to <u>hold him up to scorn</u>, <u>ridicule</u>, or <u>contempt</u>, or which is calculated to <u>render him infamous, odious, or ridiculous</u>." <u>Id</u>. (quoting <u>Moss v. Harwood</u>, 102 Va. 386, 392 (1904) (emphasis added).

In determining whether words are actionable under these standards, "it is a general rule that [the] allegedly defamatory words are to be taken in their plain and natural meaning and to be understood by courts and juries as other people would understand them, and according to the sense in which they appear to have been used." <u>Carwile v. Richmond Newspapers</u>, 196 Va. 1, 5 (1954) (as quoted in <u>Schaecher</u>). Thus, under Virginia law, courts "must decide as a threshold matter of law whether a statement is reasonably capable of defamatory meaning before allowing the matter to be presented to a finder of fact." <u>Schaecher v. Bouffault</u>, 290 Va. 83, 94 (2015)

14

The third element of defamation is intent. Where public officials are not involved, the requisite intent in Virginia is negligence. See Gazette, Inc. v. Harris, 229 Va. 1, 15 (1985) (holding that defamation plaintiffs must show "that the defendant either knew [the published statement] to be false, or believing it to be true, lacked reasonable grounds for such belief, or acted negligently in failing to ascertain the facts on which the publication was based."); see also Food Lion, Inc. v. Melton, 250 Va. 144, 150 (1995) ("[A] negligence standard applies."). The level of intent behind any alleged defamation is a question generally reserved for the finder of fact. Id.

Even if all three elements of defamation are present in the complaint, a defamation claim can be defeated by a finding of privilege. Gazette, Inc. v. Harris, 229 Va. 1, 18 (1985). In the context of defamation, privilege may be absolute or qualified. Id. The Defendants here assert qualified privilege as an argument for dismissal. (Def. Mot. 12-15). Qualified privilege in Virginia attaches to several types of communications, including those "[c]ommunications between persons on a subject in which the persons have an interest or duty." Cashion v. Smith, 286 Va. 327, 337 (2013). A plaintiff may overcome qualified privilege only by adequately pleading "malice," Great Coastal Exp., Inc. v. Ellington, 230 Va. 142, 151, 334 S.E.2d 846 (1985). And, the Supreme Court of Virginia has held "that

15

employment matters are occasions of privilege in which the absence of malice is presumed." Larimore v. Blaylock, 259 Va. 568, 574 (Va. 2000). Whether a privilege has attached is a question of law. Cashion, 286 Va. at 337. By contrast, whether a defendant has lost or abused a qualified privilege by acting outside it is a question of fact for the jury. Id.

### C. Statute of Limitations

The statute of limitations for a defamation action is one year. Va. Code Ann. § 8.01-247.1 ("Every action for injury resulting from libel, slander, insulting words, or defamation shall be brought within one year after the cause of action accrues.") Furthermore, "[a]ny cause of action that a plaintiff has for defamation accrues on the date that the defamatory acts occurred." Askew v. Collins, 283 Va. 482, 487 (2012).

The effect of successive publication or "republication" of defamatory statements is somewhat less clear under Virginia law, but, as a general principle, "each of several communications to a third person by the same defamer is a separate publication." Restatement (Second) of Torts § 577A(1) (1977). This conclusion is consistent with the decision of the Supreme Court of Virginia in Weaver v. Beneficial Fin. Co., 199 Va. 196 (1957), where the Court held that the "republication of a libelous article *by a third party*" provides a new cause of action against the original defamer, so long as the republication is "the natural and

16

probable result of what the [original] wrongdoer did." Id. at 201 (emphasis added). Thus, each successive publication of an old or preexisting defamatory statement gives rise to a new cause of action under Virginia law.

By contrast, a single publication followed by successive or additional readings of the publication gives rise to only one cause of action. This "single publication rule" applies when subsequent audiences read the same original (and allegedly defamatory) document, and is accepted by the majority of states and Virginia. See Restatement (Second) of Torts § 577A (1977); see also Katz v. Odin, Feldman & Pittleman, P.C., 332 F. Supp. 2d 909, 918 (E.D. Va. 2004) ("Virginia follows the 'single publication rule,' which permits only one cause of action to be maintained for any single publication, even if heard or read by two or more third persons.")

## DISCUSSION

Under Virginia law, Dragulescu has failed to state a claim of defamation upon which relief can be granted against the Defendants. The allegedly defamatory statements contained in the Davis letter of 2013 lack the requisite "sting" to be actionable, and are otherwise opinions. The claim against Orok is similarly defective; however, it is not necessary to address the merit of the claim against Orok because it is barred by the statute of limitations. Because the defamation claims against

17

the University are wholly derivative of the claims against the individuals, they will also be dismissed.

## A. Defamation Claim Against Davis

Dragulescu's claim of defamation against Davis is limited to at most four statements that are contained in a 2013 letter of reprimand attached to the motion before the Court. (Am. Compl. ¶¶ 25-26). None of these statements rise to the level of defamation because they lack "sting" and are otherwise non-actionable opinion. Jordan v. Kollman, 269 Va. 569, 575-76 (2005).

Dragulescu alleges that Davis "falsely accused [her] of (i) talking disparagingly about the Department, (ii) having "meltdowns" and temper tantrums; and (iii) using profanity in reference to a training session." (Am. Compl. ¶¶ 25). With respect to the third (iii) claim, Dragulescu specifically denies that she called the training "f—ing bulls—t" as stated in the Davis letter. Id. She further alleges (although it is unclear if she claims this is defamation) that (iv) "Davis also falsely attacked [her] for not properly contributing to the HBCU mission of VUU by failing to attend the University's Constitution Day Program." (Am. Compl. ¶ 27).[3] Even assuming that all the facts

---

[3] Dragulescu does not dispute the fact that she did not attend the program. (Am. Compl. ¶ 27).

alleged are true, Dragulescu has not stated a claim for defamation against Davis.

"Statements that express only the speaker's opinion and not matters of fact are not actionable as defamation because such statements cannot be shown to be false." Gov't Micro Res., Inc. v. Jackson, 271 Va. 29, 40 (2006). While the line between opinion and fact can be blurry, Virginia precedent makes it clear that the statements in the Davis letter, with the exception of the allegation of profanity, fall on the side of non-actionable opinion.

The statements that Dragulescu spoke "disparagingly," had a "meltdown" or "temper tantrum," or did not "properly contribute to the HBCU mission" are "[s]tatements that are relative in nature and depend largely upon the speaker's viewpoint." Fuste v. Riverside Healthcare Ass'n, 265 Va. 127, 132 (2003). Therefore they "are expressions of opinion" and not actionable in a defamation suit. Id. Virginia precedent makes this clear.

In Raytheon Tech. Servs. Co. v. Hyland, 273 Va. 292, 306 (2007), the Supreme Court of Virginia analyzed whether five statements contained in an analogous context—a performance evaluation—constituted fact or non-actionable opinion. Notably, that Court (reversing the lower court) held that the following allegedly defamatory statement was non-actionable opinion:

> Cynthia has also been inappropriately and
> openly critical of her leader, her peers,
> and other leaders in the company. This
> behavior is not only destructive to the
> team, it negatively impacts her image in the
> eyes of others, including customers.

Id. at 305–06. While the Supreme Court observed that this statement contained a "significant combination of fact and opinion," it concluded, after "considering the statement as a whole," that "this statement falls into the category of opinion and should not have been submitted to the jury." Id. at 306. In reaching that conclusion, the Supreme Court of Virginia notably held that, wholly apart from whether any open and critical comments had been made (questions of fact), "[w]hether the criticism was inappropriate is a matter of opinion, and accordingly the statement as a whole cannot be subject to evidentiary proof of its truth or falsity." Id. The Raytheon Court reached the same conclusion about a statement describing the plaintiff as "unwilling to accept and work with . . . feedback," as well as a characterization of the plaintiff as "frequently verbose and vocal in her opinions, to a degree that others stop participating in open dialogue." Id. at 305.

Read as a whole, the allegedly defamatory statements contained in the 2013 letter written by Davis are distinguishable from the statements deemed opinion in Raytheon. To wit, whether Dragulescu spoke "disparaging to the department"

20

is indistinguishable from whether the plaintiff in Raytheon had
been "inappropriately and open critical of her leader." Id. at
306. Similarly, whether her conduct in response to hearing her
LC class could not be taught again until fall 2014 amounted to a
"tantrum" is *a fortiori* opinion. Id. And whether Dragulescu
"properly contributed to the HBCU mission," besides not being an
actual statement made in the Davis letter, is also incapable of
being proven false. Id. Read as a whole and in context (as
Virginia law requires), these statements are therefore not
actionable.[4]

Of the various statements made in the Davis letter, the
only factual statement identified by Dragulescu as defamatory
was that she was overheard calling a training session "f-ing
bullsh-t." (Am. Compl. ¶ 25). Unlike the other statements in the
Davis letter, this allegedly defamatory remark is capable of
being proven false, and therefore meets the first requirement to
be actionable.[5] Nevertheless, this statement (as well as the

---

[4] Dragulescu relies on a well-reasoned decision from this Court
that is at odds with the analysis of the Supreme Court of
Virginia in Raytheon. See, *e.g.*, Echtenkamp v. Loudon Cty. Pub.
Schs., 263 F. Supp. 2d 1043 (E.D. Va. 2003) (holding statement
that plaintiff was "abrasive, unprofessional, and rude" to be
actionable). But, Raytheon was decided after Echtenkamp, and
Raytheon is the controlling law on this substantive state law
issue because it is a decision by Virginia's highest court on a
factually indistinguishable set of facts.

[5] Although whether something said is "profane" is typically
opinion, here specific "unacceptable" words have been attributed

21

others in the letter) lacks the "requisite level of 'sting'" necessary to be actionable. <u>Schaecher v. Bouffault</u>, 290 Va. 83, 101 (2015).[6]

"Defamatory words are those tending so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." <u>Id</u>. at 101. (internal citation omitted). As a matter of law, nothing in the Davis letter rises to this level. Even if Davis completely made up the incident of profanity described, a false statement that someone used coarse language to describe workplace training on a single occasion is hardly inflammatory. And it is not the type of statement that "tends to injure one's reputation in the common estimation of mankind." <u>Id</u>. at 92 (quoting <u>Moss v. Harwood</u>, 102 Va. 386, 392 (1904)).[7]

---

to Dragulescu. Whether Dragulescu uttered those words is a question of fact.

[6] Dragulescu also cites <u>Reynolds v. Pionear, LLC</u>, No. 3:15CV209, 2016 WL 1248866 (E.D. Va. Mar. 25, 2016), for the proposition that an asserted use of profanity can be actionable defamation. (Pl. Resp. 15). <u>Reynolds</u> is factually different than the alleged facts here because the statement provided context for other defamatory statements. Moreover, <u>Reynolds</u> did not consider the "sting" element of defamation because it was "raised for the first time on reply." <u>Id</u>. at *6, n. 15.

[7] This conclusion is further evidenced by the fact that Dragulescu was re-hired by the University despite this allegedly defamatory incident. (Am. Compl. ¶ 12).

22

As the Supreme Court of Virginia has noted, "reputation must be affected to a magnitude sufficient to render one odious, infamous, or ridiculous, or subject to disgrace, shame, scorn, or contempt." Id. at 102. A statement that an employee used profanity is not enough to satisfy that test, especially where it involves a supervisor speaking directly to an employee in the workplace over whom she has authority. Were the law otherwise, every testy encounter between employers and employees or between employees in which coarse language slipped out (where it should not have) would be actionable.  Virginia law does not go so far. For the foregoing reasons, Dragulescu has failed to state a plausible claim of defamation against Davis, and the claim against her will be dismissed.[8]

## B. Defamation Claims Against Orok

Dragulescu's claim against Orok suffers from many of the same defects as her claim against Davis. A step-by-step analysis of Orok's allegedly defamatory statements is unnecessary, however, because any claim arising from those statements expired before the filing of the Complaint in this case. Because it is apparent on the face of the Complaint that any viable defamation

---

[8] Because the contents of the Davis letter are not defamatory, the Court need not decide whether the resurfacing of the Davis letter in October of 2015, which occurred during a grievance process initiated by the Plaintiff, constituted "re-publishing" sufficient to defeat Defendants' arguments that the statute of limitations bars the Plaintiff's claims.

claim against Orok is barred by the statute of limitations, the Defendant's motion to dismiss Count III as to Orok will be granted.

The Orok Memorandum was sent on May 5, 2015. (Am. Compl. ¶ 45). Dragulescu herself initiated a grievance process on May 11, 2015, bringing the letter (and other matters) to the attention of the Faculty Senate, the VPAA (Hossain), and the Office of Student Integrity and Conduct. (Am. Compl. ¶¶ 54-59). Even Dragulescu's allegation that Orok called her a "white trailer trash whore," a statement that is not actually alleged as defamation in the complaint, is alleged to have occurred "in April 2015." (Am. Compl. ¶ 108).

The statute of limitations for defamation in Virginia is one year from publication of the defamatory statement. Va. Code Ann. § 8.01-247.1. Any potential claim against Orok for defamation therefore had to be filed by May 5, 2016 (one year after the Orok Memorandum). The complaint in this case was filed on July 7, 2016 (ECF No. 1). Dragulescu's claim is therefore time-barred.

To avoid that necessary result, Dragulescu argues that the Orok Memorandum was re-published "as part of the continuing grievance process," and, "upon information and belief, has served as the basis for rumors that were circulating as late as October 2015 around the VUU campus that Dr. Dragulescu called a

24

student 'ignorant' and 'ridiculous.'" (Am. Comp. ¶ 103). Her position is contrary to the law of defamation in Virginia.

Under the well-accepted "single publication" rule, subsequent viewings of one allegedly defamatory document do not constitute successive publications. See Restatement (Second) of Torts § 577A (1977); see also Katz v. Odin, Feldman & Pittleman, P.C., 332 F. Supp. 2d 909, 918 (E.D. Va. 2004) ("Virginia follows the 'single publication rule,' which permits only one cause of action to be maintained for any single publication, even if heard or read by two or more third persons.") Therefore, the repeated viewings of the Orok Memorandum by the Faculty Senate (which first received the letter in May of 2015) do not constitute new publications for purposes of the statute of limitations. See Katz v. Odin, Feldman & Pittleman, P.C., 332 F. Supp. 2d 909, 918 (E.D. Va. 2004). More importantly, even if they did, those repeated viewings (and a fortiori the alleged "rumors") cannot be attributed to Orok. The grievance process was initiated by Dragulescu, and the Faculty Senate received the Orok Memorandum only because Dragulescu sent it to them. (Am. Compl 54). Any further publication of the Orok Memorandum that occurred as a result of the grievance process cannot therefore be attributed to Orok.

Nor can the "rumors" that Dragulescu called a student "ignorant" or "ridiculous." (Am. Compl. 63). Under Virginia law,

25

a defendant may be liable in defamation for a third-party republication "if the republication was the natural and probable consequence of the original publication or if defendants actually or presumptively authorized its republication." <u>Watt v. McKelvie</u>, 219 Va. 645, 649 (1978) (citing <u>Weaver v. Beneficial Finance Co.</u>, 199 Va. 196 (1957)). Dragulescu argues that this principle saves her defamation claim against Orok. It does not.

To begin, Dragulescu has not properly alleged that these "rumors," mentioned only in paragraphs 67 and 103 of the Amended Complaint, constitute separate actionable claims of defamation. <u>See</u> Am. Compl. ¶ 102 ("Dragulescu has been defamed by the statements . . . specifically referenced and set forth in paragraphs 25, 45, and 48-49 herein").[9] Nevertheless, even if the "rumors" had been properly identified as defamation (and they were not), they are not attributable to Orok because they are neither a "natural" nor a "probable" consequence of Orok's original decision to send the memo to Dragulescu. <u>See</u> <u>McKelvie</u>, 219 Va. at 649. Indeed, the "rumors" for which Dragulescu blames Orok do not even match the substance of the Orok Memorandum.

Dragulescu alleges that "rumors . . . were circulating as late as October 2015 around the VUU campus that [she] had called a student 'ignorant' and 'ridiculous.'" (Am. Compl. ¶ 103). Of

---

[9] Dragulescu asserted these alleged rumors as part of her defamation claims for the first time at oral argument on November 21, 2016. That is simply too late.

course, the Orok Memorandum does not state that Dragulescu
referred *to the student* as "ignorant" or "ridiculous." Instead,
Orok wrote that "I was presented with the original student essay
with your comments *which included* such words as 'ridiculous'
'ignorant' etc." (Def. Mot. Attach. B) (emphasis added). As
already noted, "it is a general rule that allegedly defamatory
words are to be taken in their plain and natural meaning and to
be understood by courts and juries as other people would
understand them, and according to the sense in which they appear
to have been used." Carwile v. Richmond Newspapers, 196 Va. 1, 5
(1954). The plain meaning of Orok's statement is that Dragulescu
included words such as "ignorant" and "ridiculous" in her
comments on an essay, not in describing the student. And
Dragulescu does not deny that she "included" the words
"ignorant" or "ridiculous" in her comments on the essay. (Am.
Compl. ¶ 46). Therefore, not only does the Orok Memorandum lack
defamatory content, but also its content does not match the
rumors allegedly circulating VUU. Thus, even if the alleged
rumors were properly pled as separate charges of defamation,
they cannot be considered a "re-publication" of the Orok
Memorandum, much less a "natural and probable" re-publication of
it.

This conclusion is further strengthened by the fact that
the Orok Memorandum was originally sent directly *only* to

27

Dragulescu and two other administrators. (Am. Compl. ¶ 50). It was Dragulescu herself, and not Orok, who sent the memo to the Faculty Senate and initiated the "continuing grievance process" through which she alleges the letter was "republished." (Am. Comp. ¶¶ 54-65, 103). That does not fall within the republication rule applicable under Virginia law. Dragulescu has provided no authority that would permit such a ruling. Nor has the Court located such authority.[10]

It is apparent on the face of the Amended Complaint that the statute of limitations ran on the defamation claim against Orok before this action was filed. Hence, the Defendants' motion to dismiss Count III as to Orok will be granted.

### C. Defamation Claims Against the University

The defamation claim against Virginia Union University (VUU) is wholly derivative of Dragulescu's claims against Orok and Davis. (See Am. Compl. ¶ 106). Because the individual claims of defamation against Orok and Davis fail to state a claim upon which relief can be granted, Count III of the Amended Complaint also fails to state a claim for relief against the University. Thus, Count III will be dismissed as to VUU, and the Defendants' motion will be granted in full.

---

[10] In any event, Orok cannot be held responsible if the memorandum was leaked or its contents were disclosed by some member of the Faculty Sente.

## CONCLUSION

For the reasons stated herein, the Defendants' Motion to Dismiss Count III of the Amended Complaint will be granted, and Dragulescu's defamation claims will be dismissed with prejudice.


It is so ORDERED.


                              /s/       REP
                         Robert E. Payne
                         Senior United States District Judge


Richmond, Virginia
Date:  December   8  , 2016