
F I L E D
MAY 15 2017
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

LUMINITA DRAGULESCU, Ph.D.,

     Plaintiff,

v.                          Civil Case No. 3:16cv573

VIRGINIA UNION UNIVERSITY,

     Defendant.

## MEMORANDUM OPINION

This matter is before the Court on DEFENDANT VIRGINIA UNION UNIVERSITY'S MOTION FOR SUMMARY JUDGMENT (ECF No. 70). By the ORDER of May 11, 2017 (ECF No. 149), the Defendant's Motion was granted in part and denied in part. The reasons for that Order are set forth below.

## I. BACKGROUND

Virginia Union University (VUU) is an historically black college and university (HBCU). In 2012, Luminita Dragulescu, a white female, was hired to be an Assistant Professor of English in the Department of Languages and Literature ("L&L") of VUU's School of Humanities and Social Sciences ("SHSS"). She served in that position from 2012 to 2015, accepting renewed one-year offers of employment each year during that time. On March 24, 2016, Dragulescu received notice that her contract would not be renewed for the following term.

Dragulescu alleges that the decision not to renew her contract, as well as a reprimand that she received in 2015, was racially motivated in violation of Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e-2(a)(1). VUU has moved for summary judgment on both claims. In evaluating VUU's motion, the Court must view any disputed "facts and all justifiable inferences arising therefrom in the light most favorable" to Dragulescu, the non-moving party. Foster v. Univ. of Maryland-E. Shore, 787 F.3d 243, 246 (4th Cir. 2015).

## A. Facts

Dragulescu was hired in 2012 by Eveyln Davis (a black female), the chair of the L&L Department at the time. Dragulescu began teaching in the fall of 2012. Almost immediately, VUU began receiving student complaints about her, including one incident in October of 2012 in which nineteen students signed a complaint against her.[1] (Def. Mot., Ex. 8). Although she has not disputed these complaints were made, Dragulescu contends that she was not informed of "virtually all" of them, nor told that they would jeopardize her job security. (Def. Mot. 3, Pl. Resp. 3). These complaints notwithstanding, Dragulescu's contract was renewed for the 2013-2014 school term.

---

[1] Dragulescu disputes the substantive merits of these complaints, but does not dispute that the complaints were made. (PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ("Pl. Resp.") at 3-4).

In 2014, issues arose between Dragulescu and Davis. Dragulescu agrees that she was asked to encourage students to participate in "Constitution Day" at VUU and politely refused, that she was instructed to spend two of their office hours each week at the VUU Writing Center and refused to do so, and that she resisted Davis in the process of selecting a common text for English classes. (Def. Mot. 4-5, Pl. Resp. 4). Davis eventually responded by issuing Dragulescu a formal reprimand, chastising her for various incidents and expressing the hope that she would "make a genuine attempt to become a better colleague by working with and not against the department." (Def. Mot., Ex. 14).

Dragulescu believed this reprimand was unwarranted,[2] and sought relief from Linda Schlichting, the outgoing dean of SHSS. Schlichting (a white female) concluded that the reprimand was inappropriate and overly harsh, especially compared to the disciplinary actions taken against other faculty in the past who had committed more serious offenses.[3] (Pl. Resp., Ex. 2).

---

[2] In her brief in opposition, Dragulescu "disputes the substance of all of the accusations in Dr. Davis' October 3, 2013 reprimand"; however, Dragulescu has since admitted to the substance of at least some of the incidents recounted in the reprimand. See WRITTEN STIPULATIONS OF UNCONTROVERTED FACTS (ECF No. 131) at 2-3.

[3] In a declaration prepared April 17, 2017, Schlichting testified that the Davis reprimand was harsher punishment than black professors had received for "far harsher offenses." (Pl. Resp., Ex. 2). Her memo in 2013, however, does not make any racial comparisons. Id.

Therefore, Schlichting instructed Davis to have the reprimand removed from Dragulescu's file. Id. On March 6, 2014, Davis recommended Dragulescu for non-renewal. (Def. Mot., Ex. 17). Davis was overruled, and Dragulescu's contract was once again renewed, this time for the 2014-2015 term. Around the same time, Davis was promoted to a new position within VUU, Shannan Wilson (a black female) became the new chair, and Michael Orok (a black male) became the new dean of SHSS.

During the 2014-2015 term, there were more student complaints about Dragulescu. (Def. Mot. 4). She also continued to decline to devote any hours to the Writing Center. Id. Dragulescu maintains that she was not informed of most of the student complaints, and that Writing Center hours had become something less than mandatory by sometime in the spring of 2014. (Pl. Resp. 5).

In January of 2015, Dragulescu procured on behalf of VUU and the SHSS a substantial grant from the National Endowment of the Humanities ("NEH"). Orok's personal assistant, Tracy Lucas (a black female), was placed in charge of administering the grant funds within SHSS. Around this same time, Dragulescu received an invitation to present one of her papers at a conference at Oxford, and began seeking funding for the trip. At some point in March of 2015, Orok informed Dragulescu that he hoped to be able to contribute $200 towards her trip.

In April of 2015, the SHSS conducted a search for a new history professor. Dr. Raymond Hylton (a white male professor) emailed Orok seeking to be the chairperson of the search committee for the position, and requested that Dragulescu and several others be on the committee. The overall composition of the committee requested by Hylton would have included four white professors (including Dragulescu) and two black professors. In response to the request, Lucas emailed Orok directly, stating that "Dr. Dragulescu is a no-no because you need to split her and Hylton up." (Pl. Resp., Ex. 13). She also requested that Orok "throw some different people up in there; mainly African Americans," and offered her own suggestions. Id. Orok did not respond to the Lucas email, but he ultimately organized a committee that had four black professors and two white professor (and did not include Dragulescu). Dragulescu cites this sequence of events as part of the evidence of Orok's racial animus towards white individuals.

On April 30, 2015, Terry Hinton, then a professor at VUU, claims to have had a conversation with Orok in which Orok stated that Dragulescu was having an affair with Hylton, that her office "smelled like feet, ass, and sex," and that he considered Dragulescu nothing but a "white trailer trash whore." (Def. Mot., Ex. 57). Orok denies ever making these statements, but Hinton claims that he wrote down the quotations at the time. Id.

He also claims that, at some point in 2016, he destroyed his handwritten notes after preserving in electronic form. (Def. Mot., Ex. 58). Hinton was terminated for cause by VUU, sued it for discrimination in response, and accepted a lifetime ban from the campus as part of the settlement in that action. (Def. Mot., Exs. 56, 58).

Less than a week after this alleged incident, on May 4, 2015, Orok held a meeting with Dragulescu and Wilson to discuss a recent student complaint. On May 1, 2015, Dragulescu had returned a paper to a student that included comments such as "that's a ridiculous statement How could you support it?!!"; "This shows your ignorance on the topic!"; "Please revise this for logic!!"; "You just state the obvious!"; "You obviously don't know what climax of a narrative is!"; "You don't seem to have heard anything I talked to you!!" (Def. Mot., Ex. 21). The student had become upset at these comments, and he and his mother had complained to his faculty advisor, Julie Malloy (a white female). Malloy immediately alerted Wilson and Orok, who promptly requested a meeting with Dragulescu to discuss the matter.

At the meeting, Orok and Wilson spoke with Dragulescu about the incident, assured her that they did not believe she intended her editorial comments to be offensive in any way to the

student, and requested[4] that Dragulescu apologize to the student and her mother for the misunderstanding. (Def. Mot. 7, Pl. Resp. 5-7). Orok also explained that VUU was an HBCU, and allegedly suggested that Dragulescu did not perceive why her comments had offended the student because she did not understand black culture and the impact that such language would have coming from a white professor to a black student at an HBCU. (Pl. Br. 6). The parties agree that Orok did not expressly order Dragulescu to apologize, nor tell her that her job would be in any jeopardy if she refused. Id. Dragulescu declined to apologize.

Almost immediately after the meeting, Dragulescu received an email from Lucas (on Orok's behalf) informing her that the $200 Orok had previously pledged towards her Oxford trip would not be available. Then, the next day, Dragulescu received a written reprimand from Orok ("Orok Reprimand") that she now alleges constitutes an independent adverse action under Title VII.

The Orok Reprimand focused on the incident with the student's paper, but also "recognize[ed] that this was not the first time that students complained about your aberrant and negative behavior in the class." (Def. Mot., Ex. 24). In the document, Orok warned Dragulescu that the "refusal to follow my

---

[4] The parties have repeatedly and aggressively argued about the semantics involved in this "request," though they agree that Orok and Wilson "expected" her to apologize.

instructions is inappropriate and amounts to insubordination, [sic] subsequent actions such as this will not be tolerated." Id. The reprimand also counseled Dragulescu that her "continuous refusal to follow administrative directions is professionally irresponsible and may lead to additional personnel actions." Id. Following VUU's prescribed procedure, Dragulescu initiated a formal grievance in response.

On May 5, 2015, Wilson formally recommended that Dragulescu's contract not be renewed. Wilson's recommendation cited concerns about Dragulescu's interactions with students and her refusal to comply with the suggestions of superiors. (Def. Mot., Ex. 26). Orok responded by requesting further documentation of Wilson's concerns. (Def. Mot. 8). Wilson provided Orok with various student complaints, as well as documentation of Dragulescu's interactions with Davis (including the reprimand Schlichting had ordered rescinded). Id. Orok concurred with Wilson, and issued his own recommendation that Dragulescu's contract not be renewed. (Def. Mot., Ex. 27). Dragulescu contends that several of the complaints ultimately included in this process were specifically solicited by Wilson from students. (Pl. Resp. 13).

The parties dispute how VUU leadership responded to the Orok and Wilson recommendations, but both sides agree that Dragulescu's contract was ultimately renewed for the 2015-2016

term. VUU President Claude Perkins explained that he wished to give Dragulescu another opportunity to improve, (Def. Mot., Ex. 28), but Dragulescu contends that she was renewed only because any contrary decision would have violated an internal VUU policy to give 45 days notice before any non-renewal decision. Dragulescu also claims that Orok specifically withheld Dragulescu's contract while he waited to see if VUU would accept his and Wilson's recommendation.

On May 11, 2015, Wilson performed a formal evaluation of Dragulescu (and other professors in her department). After receiving the lowest score in her department, Dragulescu added this performance evaluation to the grievance that she had already initiated in response to the Orok reprimand. The grievance process was handled by the Faculty Senate, a body composed of faculty members who hear such claims and provide non-binding recommendations to the President for further action.

At one point during the grievance process, the various committee members exchanged emails regarding when and if Orok would be permitted to give his side of the story. (Pl. Resp., Ex. 17). Hylton, who was on the grievance committee, commented as part of this sequence that he was "skeptical about Dr. Orok's story" but was willing to hear him out. Id. This exchange was then forwarded to Orok by another committee member, Gerard McShepard. Orok replied to McShepard with the following:

Raymond Hylton is an hypocrite. Whether he believes me or not is irrelevant. That is his opinion. He wants me to say what he wants to hear. He should go to VCU and try that mess and see how long he will last. Dr. Dragulescu has historically abused her students and when I asked her to apologize to the student parents in the presence of her chair, she refused and I wrote her up for insorbordination. Period. What is there not to believe. Did she refuse to do what I told her to do or did she not? Did she abuse her student over the past two years and it's documented or did she not. If they want me there then I must bring Dr.?eve Davis to bring all kinds of documentation and I will bring mine. They need to settle down and teach the students, that what they were hired to do. By the way, if I had anything against Hylton or Dragulescu why would I have them in the recent publication . I did not have to do that. Also, you se to be the only Black face on this committee. This is really a sad state of affairs. Ray Charles is blind and dead and if he saw that woman's rap sheet of abuse and insults he would be very upset. Enough said. I wait on the side line and see them scramble and throw mud.

(Pl. Resp., Ex. 17) (errors in original). Dragulescu cites this "black face" email as additional evidence of Orok's racial animus.

On September 20, 2015, the Faculty Senate issued two resolutions in response to Dragulescu's grievance. The first declared that Dragulescu's conduct did not constitute "insubordination" as that term had been defined in the Faculty Handbook. (Def. Mot., Ex. 39). The Committee therefore recommended that the "letter of reprimand from Dr. Orok be retracted and removed from her record." Id. Secondly, the Committee determined that Wilson had not conducted her evaluations according to the Faculty Manual, and recommended

that the evaluation be redone. Id. The recommendations were sent to Zakir Hossain, the Vice President of Academic Affairs, who eventually oversaw Dragulescu's new evaluation in January of 2016 (which improved from a 2.5 to a 4.24 after she was given credit for having obtained the NEH Grant).

The parties dispute how VUU responded to the first resolution of the Faculty Senate. Dragulescu contends that Hossain and Perkins "pocket vetoed" the recommendation by refusing to act on it, and that they did so because Hossain disagreed with it. (Def. Resp. 8-9). Nevertheless, the evidence suggests that this dispute is immaterial. Dragulescu has taken the position that the recommendation was intended so that "any official documentation that the university keeps on Dr. Dragulescu . . . make no mention of that letter." (Def. Resp., Ex. 9) And, Dragulescu now concedes that the Orok Reprimand was neither used, nor directly referenced, in the process that ultimately led to her non-renewal (i.e., it was not in the packet of materials sent to Perkins).

In January of 2016, Monique Akassi replaced Shannan Wilson as chair of the L&L Department. Not long thereafter, Akassi began receiving complaints from students about Dragulescu, who allegedly "refused to cooperate" with Akassi in resolving the issues. (Def. Mot., Ex. 49). Dragulescu disputes the substance of the student complaints involved, but does not deny that

Akassi received them (or that she did not do as Akassi requested). (Pl. Resp. 38).

On January 27, 2016, Akassi also received a memo from the outgoing chair, Wilson, detailing some of her previous issues with Dragulescu and recommending that Dragulescu be terminated from the department. (Def. Mot., Ex. 53).[5] On February 1, 2016, citing a "great concern" over an "alarming number of students emailing me and coming to my office," Akassi sent Orok a memo concurring with Wilson's outgoing recommendation and asking that Dragulescu's contract not be renewed for the 2016-2017 term. (Def. Mot., Ex. 53). Orok concurred with the recommendation, and added his own on February 10, 2016. Id. Orok's recommendation referred back to his 2015 recommendation, stating "his understanding" that his previous recommendation had not been considered because it "it did not meet the threshold for informing faculty as established in the university handbook." Id. Orok contends that he based his 2016 recommendation on his belief that Dragulescu had not improved her behavior. Id.

On February 11th, Akassi issued a second formal recommendation of non-renewal. Id. This time, she specified only

---

[5] Dragulescu alleges that Wilson's recommendation was racially motivated on the basis of a single post from Twitter in April of 2015, in which Wilson stated that "WHITE WOMEN HAVE SEX WITH OUR CHILDREN AND DON'T EVEN FACE JAIL TIME NOR REGISTER AS A SEX OFFENDER! BLASPHEMY!" (Pl. Resp., Ex. 18). There is no evidence, however, that this "tweet" pertained to Dragulescu or the recommendation not to renew her contract.

that she had "decided to take the Department of Languages and Literature in a different direction." Id. The same day, Orok forwarded Akassi's second recommendation to Hossain along with a second recommendation of his own, which stated his agreement with Akassi. Id. On February 15, 2016, Hossain endorsed the recommendations of Orok and Akassi and issued his own conclusory recommendation that Dragulescu be non-renewed. Id. Hossain forwarded his recommendation along with a packet of materials to Perkins for his review. The packet contained (1) the Orok recommendation from 2015; (2) the Wilson recommendation from January 27, 2016; (3) the Akassi recommendation from February 1, 2016; (4) the Orok recommendation from February 10, 2016; (5) the second Akassi recommendation from February 11, 2016; and (6) the second Orok recommendation from February 11, 2016. Id. Relying on the recommendations of those below him, Perkins notified Dragulescu of his decision not to renew her contract on March 24, 2016. (Def. Mot., Ex. 54).

## B. Procedural Posture

Dragulescu filed her initial EEOC Charge on December 28, 2015, citing the Orok Reprimand and various other incidents as evidence of discrimination. (Def. Mot., Ex. 48). She filed her second charge on March 30, 2016 after she was non-renewed.

Dragulescu received no-action letters in response to both charges, and promptly filed suit.

Dragulescu's FIRST AMENDED COMPLAINT (ECF No. 10) included claims of defamation against Orok and Davis along with her Title VII claims, which at the time also alleged discrimination on the basis of sex and national origin in addition to race. Dragulescu's defamation claims were dismissed by Memorandum Opinion (ECF No. 30) on December 9, 2016, and her claims of retaliation and sex and national origin-based discrimination have since been withdrawn. (ECF Nos. 131, 146). All that remains to consider on summary judgment are Dragulescu's two claims of race-based discrimination: one based on the Orok Reprimand and one based on her non-renewal in 2016. VUU seeks summary judgment on both claims, arguing that the Orok Reprimand does not qualify as an adverse action under Title VII, and that Dragulescu has not produced sufficient evidence of discrimination on her non-renewal claim. Following extensive briefing and oral argument on the motion, the Court issued an ORDER granting summary judgment on the former claim (the Orok Reprimand) and denying it as to the latter (the non-renewal). (ECF No. 149). This Memorandum Opinion sets forth the reasons for that decision.

## II. LEGAL STANDARD

The parties agree that no direct evidence of discrimination exists in this case and that the traditional *McDonnell-Douglas* framework applies.[6] Under this burden-shifting framework, the summary judgment analysis proceeds in three steps. Step one is the plaintiff's prima facie case.

To establish a prima facie case of discrimination, a plaintiff must show: (1) that she is a member of a protected class; (2) that she suffered adverse employment action; and (3) that other employees who are not members of the protected class were treated more favorably. Bryant v. Bell Atl. Md., Inc., 288 F.3d 124, 133 (4th Cir. 2002). If the plaintiff meets this burden, it creates an inference of discrimination that falls on the employer to rebut. The employer can do so by producing admissible evidence showing that it had a legitimate, non-discriminatory reason for the challenged employment action. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981).

Once a defendant produces a legitimate, non-discriminatory reason for the challenge conduct, the presumption of

---

[6] The Court is aware that there is a split of authority among the circuits and among the district courts of the Fourth Circuit on the governing legal standard for proving discrimination by indirect evidence in reverse discrimination. Because both parties agree that the regular *McDonnell-Douglas* framework applies, the Court need go no further in its analysis.

discrimination disappears. Id. The plaintiff then "has an opportunity to prove by a preponderance of the evidence that the neutral reasons offered by the employer 'were not its true reasons, but were a pretext for discrimination.' Merritt v. Old Dominion Freight Line, Inc., 601 F.3d 289, 294 (4th Cir. 2010) (quoting Burdine, 450 U.S. at 253). At this stage, the pretext analysis "merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination." Id. Thus, "the issue boils down to whether the plaintiff has presented a triable question of intentional discrimination, and 'the McDonnell Douglas framework—with its presumptions and burdens—is no longer relevant.'" Id. at 295. Summary judgment will therefore be appropriate only where "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Id.; see also Fed. R. Civ. P. 56(c).

### III. DISCUSSION

VUU is entitled to summary judgment on Dragulescu's independent claim of discrimination based upon the Orok Reprimand; however, Dragulescu has presented enough evidence to create a triable question as to whether Orok's recommendation for non-renewal was motivated by racial considerations. The

Court therefore denies VUU's motion for summary judgment as to Dragulescu's claim of discriminatory non-renewal.

### A. "The Orok Reprimand"

Summary judgment for VUU is appropriate on the question of the Orok Reprimand because Dragulescu has not presented any evidence that she suffered real harm as a result of the reprimand (*i.e.*, a dock in pay, fewer responsibilities, etc.). Because the Orok Reprimand "did not lead to further discipline" apart from the ultimate non-renewal decision, it cannot be considered an independent adverse action under Title VII. <u>Adams v. Anne Arundel Cty. Pub. Sch.</u>, 789 F.3d 422, 429 (4th Cir. 2015). Consequently, summary judgment must be granted.

Dragulescu argues that the Orok Reprimand "worked a serious and real employment injury" because it was "used, in fact, as a basis" for Orok's recommendations of non-renewal, and because the "reprimand is actually the first step under VUU's Faculty Handbook for being terminated *for cause*." (Pl. Resp. 14). Neither argument is persuasive.

To begin, Dragulescu now admits that the Orok Reprimand was not actually used or directly referenced in any of the various recommendations for her non-renewal. (Tr. of SJ Hr'g 36:8-38:6). Instead, Dragulescu's argument rests on the premise that the

various actors involved were required to forget and disregard all memories of the events that led to the Orok Reprimand. Id. This view has no support in the law, and Dragulescu has offered no precedent suggesting otherwise. Moreover, to the extent that the Orok Reprimand actually was relied upon in the decision not to renew her contract, it would still not constitute an adverse action. Instead, it would simply "become[] relevant evidence" in assessing the "true adverse employment action (e.g., discharge, demotion, etc.)." Jeffers v. Thompson, 264 F. Supp. 2d 314, 330 (D. Md. 2003).

In any event, the evidence in the record shows that the Orok Reprimand was never placed in Dragulescu's file, but rather was relegated to some general repository where it was never used. Moreover, Dragulescu admits that it was neither included nor directly referenced in any of the materials used by Perkins in making the decision not to renew Dragulescu's contract. (Tr. of SJ Hr'g 36:8-38:6). Under such circumstances, the 'Orok Reprimand" was just that: a reprimand, "not [a] signpost[] on a predetermined path to a true adverse employment action." Adams, 789 F.3d at 429. Thus, it cannot therefore be used to support an independent claim of discrimination under Title VII. Summary judgment for VUU will therefore be awarded.

## B. "The Non-Renewal Decision"

Dragulescu's claim of non-renewal is more difficult to assess. While she has proven her prima facie case of discrimination, VUU has produced evidence of a legitimate and non-discriminatory reason for the non-renewal decision: specifically, Dragulescu's continuous difficulties with students and her refusal to follow the instructions of her superiors. Thus, the question becomes whether Dragulescu has presented sufficient evidence to create a triable issue as to whether "the neutral reasons offered by the employer 'were not its true reasons, but were a pretext for discrimination.'" Merritt v. Old Dominion Freight Line, Inc., 601 F.3d 289, 294 (4th Cir. 2010). Cognizant that the contested "facts and all justifiable inferences arising therefrom" must be construed "in the light most favorable" to Dragulescu at this stage, the Court concludes that a triable issue exists as to whether Orok's recommendations were motivated by racial animus. Foster, 787 F.3d at 246. Summary judgment on Dragulescu's claim of discriminatory non-renewal must therefore be denied.

VUU asserts two primary arguments in support of its motion for summary judgment on Dragulescu's non-renewal claim. First and foremost, VUU argues that Dragulescu has failed to produce sufficient evidence of pretext to survive summary judgment. (Def. Mot. 26-28). Alternatively but relatedly, VUU argues that

any evidence of racial animus on the part of Orok is irrelevant because "two layers of decision-making authority . . . rested between Orok and VUU's non-renewal decision." Id. at 27. Neither argument can prevail at this stage of the litigation.

Although VUU focuses on evidence of pretext, the Supreme Court and the Fourth Circuit have cautioned courts to "resist the temptation to become so entwined in the intricacies of the McDonnell Douglas proof scheme that they forget that the scheme exists solely to facilitate determination of the ultimate question of discrimination vel non." Merritt, 601 F.3d at 295 (quoting Proud v. Stone, 945 F.2d 796, 798 (4th Cir.1991)). In other words, the pretext inquiry is not viewed in a vacuum; instead, it must be assessed with the understanding that "[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 153 (2000). Viewing the evidence in this light, Dragulescu has demonstrated that there is a triable issue of discrimination for the jury.

On the ultimate question of intentional discrimination, the evidence in this case is not particularly overwhelming. Dragulescu offers only a handful of discrete incidents suggestive of discrimination, and some of the incidents are insufficient to show animus as a matter of law. For example, the

only evidence Dragulescu offers to show animus on the part of Shannan Wilson is a single post on Twitter from April of 2015, nearly a fully year before Dragulescu's non-renewal. That "tweet," in which Wilson declared that "WHITE WOMEN HAVE SEX WITH OUR CHILDREN AND DON'T EVEN FACE JAIL TIME NOR REGISTER AS A SEX OFFENDER! BLASPHEMY!", is categorically insufficient to show racial animus. It does not mention Dragulescu or relate in any way to her employment, and it is temporarily disconnected from the challenged employment action in this case. In other words, it is precisely the type of evidence the Fourth Circuit has dismissed as evidence of racial discrimination. See Brinkley v. Harbour Recreation Club, 180 F.3d 598, 608 (4th Cir. 1999) ("[T]o prove discriminatory animus, the derogatory remark cannot be stray or isolated and '[u]nless the remarks upon which plaintiff relies were related to the employment decision in question, they cannot be evidence of [discrimination].'); see also Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 36 (1st Cir. 2001) (noting that while "stray remarks may be material . . . their *probativeness is circumscribed* if they were made in a situation temporally remote from the date of the employment decision, *or* ... were not related to the employment decision in question, *or* were made by nondecisionmakers.") (emphasis in original). The Wilson tweet fails all these tests. Consequently,

Dragulescu's contention that Wilson also harbored animus cannot be credited in evaluating VUU's motion.[7]

By contrast, the evidence offered against Orok is sufficient to create a triable issue for the jury. At the very least, Dragulescu has offered indirect evidence suggesting that Orok views events at VUU through a racial lens. More importantly, a jury could reasonably find that Orok's non-renewal recommendation was racially motivated based on the evidence that Orok: (1) reconstituted a search committee to increase the ratio of black professors to white professors (omitting Dragulescu from the committee in the process), (2) lamented the lack of "black face[s]" on the Faculty Senate committee handling Dragulescu's grievance, and (3) called Dragulescu a "white trailer trash whore" to one of Dragulescu's co-workers (Hinton) within a week of issuing her a formal reprimand and recommending her nonrenewal in 2015.

Similarly, a jury could surmise pretext from proof that: (1) the Faculty Senate specifically declared that Dragulescu had not been insubordinate (as claimed in the Orok Reprimand), (2) the Faculty Senate found that Wilson's evaluation of Dragulescu

---

[7] One might still legitimately ask how an educated person might make such a strange statement. One might even consider such a comment as evincing a bent to view matters in general through the lens of race. But, it cannot be considered as evidence of racial animus in the non-renewal decisional process because it was neither tethered to that process nor shown to be in any way connected to Dragulescu.

was defective (and that the evaluation was later revised upward); (3) that Orok and Akassi gave two significantly different reasons for recommending non-renewal in the weeks leading up to decision to let her go; and (4) that Wilson specifically solicited complaints from students at Orok's behest. Taken together, Dragulescu has produced enough evidence to withstand summary judgment, because a jury reasonably could find that Orok's recommendation, on which Perkins acted, was racially motivated.

Unlike the Wilson tweet, the evidence of animus recounted above relates directly to Dragulescu, her employment, and her race. Moreover, at least with respect to the "black face" and "white trailer trash whore" comments, those statements are sufficiently racially charged that a jury could interpret them as evidence of racial animus.[8] And, while VUU has repeatedly insisted that "Hinton's testimony is inherently incredible" and should not be considered, "[c]redibility determinations . . . are jury functions, not those of a judge." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) Thus, while reasonable minds might well view Hinton's assertions with a skeptical eye, at least "[i]n the summary judgment context, a court is simply not empowered to make such determinations." In re French, 499

---

[8] By contrast, the fact that Orok suggested to Dragulescu that she "did not understand black culture" during the student-paper incident is not, even if proven, evidence of racial animus.

F.3d 345, 354 (4th Cir. 2007). Instead, the Court is required to view all facts and reasonable inferences in the light most favorable to Dragulescu. Applying that principle, Dragulescu has shown enough to warrant a jury decision on the "ultimate question" of "whether the plaintiff was the victim of intentional discrimination." Reeves, 530 U.S. at 153.

VUU's second argument—that any racial animus in the record is somehow purged by the "two layers of decision-making authority . . . between Orok and VUU's non-renewal decision"— must also fail at this stage. (Def. Mot. 27). While it is true that Dragulescu does not allege that either Hossain or Perkins (the two decision-makers above Orok) harbored any animus towards her, this does not preclude liability under Title VII. Dragulescu could still prevail under the so-called "cat's paw" theory of liability, which "imposes liability on an employer for the discriminatory motivations of a supervisor who was 'principally responsible' for an adverse employment decision, even if that supervisor was not the formal decisionmaker. Belyakov v. Med. Sci. & Computing, 86 F. Supp. 3d 430, 443 (D. Md. 2015).

As the Supreme Court recently explained in an analogous context, where "a supervisor performs an act motivated by [discriminatory] animus that is intended by the supervisor to cause an adverse employment action, and if that act is a

proximate cause of the ultimate employment action, then the employer is liable under [the Act]." Staub v. Proctor Hosp., 562 U.S. 411, 422 (2011) (interpreting USERRA, an act "very similar" to Title VII). Id. Thus, if a jury were to conclude both that (1) Orok's recommendations were racially motivated and (2) that the recommendations were a proximate cause of Perkins' decision not to renew Dragulescu's contract, liability would attach under Title VII. Here, the evidence in the record shows that Perkins did not conduct his own independent investigation into Dragulescu's conduct (or that he even spoke with her) before determining not to renew her contract. To the contrary, the record shows that he merely relied upon the recommendations of his subordinates, including Orok, in making the decision not to renew Dragulescu's contract. At this stage, where inferences fall in Dragulescu's favor, this is sufficient to survive summary judgment (as, at the very least, it creates an additional material fact in dispute).

In sum, genuine issues of material fact exist as to whether Orok's recommendations for non-renewal were motivated by race, and those facts, if proved by Dragulescu, could render VUU liable under Title VII. Thus, VUU's request for summary judgment on the issue of Dragulescu's non-renewal must be denied.

## IV. CONCLUSION

For the reasons set forth above, the DEFENDANT VIRGINIA UNION UNIVERSITY'S MOTION FOR SUMMARY JUDGMENT (ECF No. 70) has been granted in part and denied in part.

It is so ORDERED.

/s/ _REP_

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: May _15_, 2017